182 Cal.App.4th 475 (2010)
THE PEOPLE, Plaintiff and Respondent,
v.
ROBERT ADDISON CISSNA, Defendant and Appellant.
No. D053464.
Court of Appeals of California, Fourth District, Division One.
February 26, 2010.
*481 Charles M. Sevilla for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Jeffrey J. Koch and Gary W. Brozio, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
HALLER, J.
The right to a trial by jury is guaranteed by the state and federal Constitutions and is a cornerstone of our legal system. We entrust to 12 jurors the solemn task of judging the credibility of witnesses, evaluating the significance of the evidence, and ultimately determining whether a defendant in a criminal trial is guilty.
*482 To maintain the integrity of the process, potential jurors are screened for bias through the voir dire process. Those selected take an oath to follow court instructions designed to protect the deliberative process, eliminate outside influences, and generate a decision based solely on the evidence presented at trial. Jurors are told that to ensure both sides receive a fair trial, they are not to discuss the case with anyone and that deliberations must occur only in the jury room.
Here, a juror ignored these admonitions and violated his sworn duties by speaking on a daily basis about the merits of the case with his nonjuror friend. After defendant was found guilty, he learned of this juror misconduct and moved for a new trial. The prosecutor agreed the juror's conduct constituted misconduct and created a presumption of prejudice, but argued the presumption of prejudice had been rebutted. The court ruled the presumption of prejudice had been rebutted and denied the new trial motion. On appeal, defendant challenges this and several other rulings.
We conclude the trial court erred in denying the new trial motion. Because the conversations with the nonjuror were pervasive, focused on deliberative matters concerning the merits of the case, and included discussions of defendant's decision not to testify, the misconduct was prejudicial. The conversations interfered with the deliberative process and the right to have the case decided by 12 impartial jurors. When even one juror lacks impartiality, the defendant has not received a fair trial. The juror misconduct in this case requires that the judgment be reversed.
For guidance upon retrial, we address two additional contentions of error raised on appeal: one concerning the victim's diary and the other pertaining to the jury unanimity requirement. We hold that if the prosecution introduces excerpts of the diary into evidence, the defense is entitled to examine the entire diary, subject to appropriate protective orders. Also, we reject defendant's contention that Penal Code[1] section 288.5, which defines a continuous-course-of-conduct offense, violates his right to a unanimous jury verdict.

FACTUAL AND PROCEDURAL BACKGROUND
S., the victim in this case, is defendant's granddaughter.[2] S. lived with her parents in San Diego County, and defendant lived with his wife (S.'s grandmother) in another county. The relatives frequently visited each other at their respective homes. S., aged 16 at the time of trial, testified that defendant molested her during these visits. The molestations started in 1998 when she *483 was seven years old. At her home, the molestations occurred primarily in her bedroom when defendant came upstairs to her room to kiss her goodnight. At defendant's home, the molestations usually occurred when she was on a rollaway bed on the floor in her grandparents' downstairs bedroom. S. also recalled being molested when she was lying between her grandfather and grandmother in their bed, and on one occasion in San Diego County when she was in her bathing suit.
S. testified that during these incidents, defendant typically rubbed her vagina with first initial, his hand, and she rubbed his penis with her hand. On some occasions defendant also performed oral sex on her vagina. The molestations occurred virtually every night when defendant was visiting at her residence or she was visiting at his residence. S. recalled that on one visit to her grandparents' home when she was about nine or 10 years old, defendant came into the room when she was writing in a journal about the visit. Defendant told her "to make sure that [she] never wrote anything down or told anyone because it was [their] little secret."
S. and her mother recounted two specific incidents that occurred at S.'s house. On one occasion when S. was about eight, she asked her mother if it was "okay" if defendant did not come to her room that evening to say goodnight. S.'s mother, who knew nothing about defendant's conduct, responded that it was important for her grandfather to have his "special time" with her. Defendant then came to her room as usual and molested her. On another occasion when S. was about nine years old, her mother entered her bedroom and unknowingly interrupted the molestation. According to S., defendant was standing by her bed and she was rubbing his penis with "his boxers . . . pulled aside." S. saw "the light of the door opening," and defendant sat down on the bed "really fast." Her mother entered the room, stated it was getting late and S. had to go to bed, and then walked back out. Defendant commented "that was close," and left the room.
During this second incident, S.'s mother recalled that she had been downstairs talking with her husband and mother. Because it seemed that her father had been upstairs for an extended period of time and she wanted S. to go to sleep, she went upstairs and noticed that S.'s bedroom door was closed, which was unusual. When she opened the bedroom door, S. was lying on her bed on her back with no blankets on and defendant was seated on the side of the bed with his head "pointing down at the floor." Defendant did not look at her or initially respond; when she walked over to him and put her hand on his shoulder and stated S. needed to go to bed, he mumbled, "just a minute."
*484 The molestations continued until S. was about 12 years old, when S. realized that her grandfather's conduct was wrong. She asked him to stop, and he complied.
About two years later, in 2005 and early 2006, S. (now aged 14) told two of her friends about the molestation. She also kept a diary during this time period, and on April 23, 2006, wrote: "There is something I really want to say. But I don't know. I've told people. But I've never put it down in writing. But I reall[]y . . . want to get it off my chest. My poppy [defendant] raped me. He started when I was about 9. I don't remember how. He never had intercourse & he never kissed me. But we did everything in between. He scarred me for life. I'm not afraid to admit it. But I'm really afraid I'll end up telling the wrong person & they will tell my mom. Because if she ever finds out, I think it would scar her too. But I think it[']s important for her to know. But not now. but when? how? Life sucks. What can you do?"
In May 2006, S.'s mother read the April 23 entry without S.'s knowledge. Shortly thereafter, she informed S.'s father about this, and the two spoke with S. S. confirmed that the molestation had happened. She told her parents that she had intended to tell them about the molestation after defendant died because she did not want to upset the family.
In addition to testimony from S. and her mother, the prosecution presented testimony from a number of other witnesses, including S.'s father, the friends in whom S. had confided about the molestation, an investigating detective, an expert witness who explained delayed disclosure and other matters, and (in rebuttal) witnesses who attested to S.'s honest character.
In defense, several family members and friends, as well as an expert witness, testified on defendant's behalf to support that he did not have the character to molest S. and there were no indications that he had molested S. or any other child. Three of defendant's other grandchildren (a teenage granddaughter, an adult granddaughter, and an adult grandson), who had all spent the night at defendant's home, testified that defendant never touched them inappropriately and they never saw anything suggesting he touched any child inappropriately.

Jury Verdict
Defendant was charged with eight sexual offense counts. Count 1 alleged continuous sexual abuse of a child under age 14 from August 20, 1998, to June 30, 2001. (§ 288.5, subd. (a) [three or more acts over a period of not less than three months].) The remaining counts alleged lewd conduct and oral copulation with a person under age 14 during various time periods between *485 July 2001 through December 2002. The first trial ended in a mistrial after the jury deadlocked on the charges. After a second trial, the jury reached a guilty verdict on count 1. The jury was deadlocked on counts 2 through 8, and the court dismissed these charges. The court sentenced defendant to the lower term of six years for the count 1 section 288.5 conviction.

DISCUSSION

I. Juror Misconduct

A. Background

After the jury rendered its guilty verdict, defendant moved for a new trial contending that the conviction must be set aside because of juror misconduct arising from Juror D.'s daily discussions about the case with his friend, G.
Defendant submitted declarations from Juror D. and from G. Juror D. and G. declared that they talked "each day at lunch about the case starting the first day of testimony." Further, every evening (or most evenings) during the trial G. called Juror D. and they talked about the case.[3]
Juror D. described the content of their discussions as follows. After three to four days of testimony he told G. that he thought defendant "was on a sinking ship." Toward the end of the prosecution's case, G. told Juror D.: "`[W]e're looking for a motive [for S. to falsely accuse defendant], and we can't find a motive yet' . . . ." The two men discussed different motives S. might have, such as the possibility that defendant was rich and was "cutting . . . off" S.'s part of the family or that another granddaughter "maybe [was] getting everything and [S.] was not." During the defense case, Juror D. commented to G. that he did not think defendant was going to testify. In response, G. told Juror D. to consider "OJ" and another high-profile defendant who did not testify and who "`got off the hook'" even though they were guilty. Regarding S.'s testimony, Juror D. told G. that a portion of her presentation appeared "staged" and that she was looking down during her testimony.
G.'s declaration essentially corroborated Juror D.'s description of their discussions, and included some additional information. G. declared that he told Juror D. that defendant was guilty if S. did not have a motive for falsely accusing him. Further, he told Juror D. that "guilty people do not testify, and if the defendant was not guilty he would testify." G. described several other matters that they discussed relating to witness testimony and evidentiary *486 items. Regarding his final conclusion concerning guilt, G. declared: "Toward the end of the case, I told [Juror D.] I did not believe the evidence was sufficient to support a guilty verdict."
At the new trial motion proceedings, the prosecution conceded, and the court found, that Juror D. had engaged in misconduct by discussing the case with his friend. However, the court concluded the record showed Juror D. was not biased against defendant because of the misconduct. The court reasoned that Juror D.'s statement that defendant was on "a sinking ship" did not reflect his final conclusion that he was guilty; the consideration of whether the victim had a motive to lie was not an improper consideration; it was a normal human reaction to wrestle with the question of why defendant did not testify; ultimately the friend rendered an opinion not to convict based on the insufficiency of the evidence; and the friend's opinion did not sway Juror D. Accordingly, the court denied the new trial motion.

B. Legal Principles

(1) A defendant has a constitutional right to a trial by an impartial jury. (In re Hamilton (1999) 20 Cal.4th 273, 293 [84 Cal.Rptr.2d 403, 975 P.2d 600].) An impartial jury is one in which no member has been improperly influenced and every member is capable and willing to decide the case solely on the evidence before it. (Id. at p. 294.) To effectuate this right, the prospective jurors are subjected to voir dire questioning under oath to uncover any bias, and the selected jurors are sworn to decide the case based on the evidence presented to them and the instructions given by the court. (People v. Wilson (2008) 44 Cal.4th 758, 822 [80 Cal.Rptr.3d 211, 187 P.3d 1041]; People v. Blackwell (1987) 191 Cal.App.3d 925, 929 [236 Cal.Rptr. 803]; Code Civ. Proc., § 232.)
(2) Further, to preserve impartiality the jury's deliberative process is shielded from all outside influences. As stated in People v. Bradford (2007) 154 Cal.App.4th 1390, 1413-1414 [65 Cal.Rptr.3d 548]: "`[T]he jury's verdict must be based upon the evidence adduced at trial uninfluenced by extrajudicial evidence or communications or by improper association with the witnesses, parties, counsel or other persons.' [Citation.] `Equally implicit in this constitutional guaranty is the right to have the jury's deliberations conducted privately and in secret, free from all outside intrusions, and extraneous influences or intimidations.' [Citation.] Thus, `private, confidential deliberations outside of the presence of all nonjurors are an essential feature of the right to an impartial jury . . . .'"
(3) To challenge the validity of a verdict based on juror misconduct, a defendant may present evidence of overt acts or statements that are objectively ascertainable by sight, hearing, or the other senses. (People v. Danks *487 (2004) 32 Cal.4th 269, 302 [8 Cal.Rptr.3d 767, 82 P.3d 1249]; Evid. Code, § 1150, subd. (a).) No evidence may be presented concerning the subjective reasoning processes of a juror that can neither be corroborated nor disproved; rather, the effect of any misconduct is evaluated based on an objective standard of whether there is a substantial likelihood of juror bias. (People v. Danks, supra, at p. 302; In re Hamilton, supra, 20 Cal.4th at pp. 294, 296; In re Carpenter (1995) 9 Cal.4th 634, 653-654 [38 Cal.Rptr.2d 665, 889 P.2d 985].)
When the record shows there was juror misconduct, the defendant is afforded the benefit of a rebuttable presumption of prejudice. (People v. Pierce (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91]; People v. Loker (2008) 44 Cal.4th 691, 746-747 [80 Cal.Rptr.3d 630, 188 P.3d 580].) This presumption is provided as an evidentiary aid to the defendant because of the statutory bar against evidence of a juror's subjective thought processes and the reliability of external circumstances to show underlying bias. (In re Hamilton, supra, 20 Cal.4th at p. 295; In re Carpenter, supra, 9 Cal.4th at pp. 651-652, 657.) If a review of the entire record shows no substantial likelihood of juror bias, the presumption has been rebutted. (In re Hamilton, supra, at p. 296; In re Carpenter, supra, at p. 653.)
(4) Juror bias does not require that a juror bear animosity towards the defendant. Rather, juror bias exists if there is a substantial likelihood that a juror's verdict was based on an improper outside influence, rather than on the evidence and instructions presented at trial, and the nature of the influence was detrimental to the defendant. (In re Hamilton, supra, 20 Cal.4th at p. 294; People v. Honeycutt (1977) 20 Cal.3d 150, 157-158 [141 Cal.Rptr. 698, 570 P.2d 1050]; People v. Barton (1995) 37 Cal.App.4th 709, 719 [43 Cal.Rptr.2d 671].)
The question of what constitutes juror bias varies according to the circumstances of the case. (See People v. Nesler (1997) 16 Cal.4th 561, 580 [66 Cal.Rptr.2d 454, 941 P.2d 87].) When, as here, juror misconduct arises from a juror's receipt of extraneous information, juror bias can bein herent or circumstantial. (People v. Loker, supra, 44 Cal.4th at p. 747; People v. Danks, supra, 32 Cal.4th at p. 303; In re Carpenter, supra, 9 Cal.4th at p. 653.) Under the inherent bias test, the court considers whether the "extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror." (In re Carpenter, supra, at p. 653; see People v. Loker, supra, at p. 747; People v. Danks, supra, at p. 303.) Even when the extraneous information is not so prejudicial, in and of itself, as to cause inherent bias, under the circumstantial bias test the court must examine the totality of the circumstances surrounding the misconduct to determine whether a substantial likelihood of actual bias nonetheless arose. (In re *488 Carpenter, supra, at p. 654; People v. Loker, supra, at p. 747.) The judgment must be set aside if the court finds prejudice under either the inherent or circumstantial bias test. (In re Carpenter, supra, at p. 653.) "[B]efore a unanimous verdict is set aside, the likelihood of bias under either test must be substantial." (Id. at p. 654.)
Ultimately, the test for determining whether juror misconduct likely resulted in actual bias is "different from, and indeed less tolerant than," normal harmless error analysis. (People v. Marshall (1990) 50 Cal.3d 907, 951 [269 Cal.Rptr. 269, 790 P.2d 676]; see In re Carpenter, supra, 9 Cal.4th at p. 654.) If the record shows a substantial likelihood that even one juror "was impermissibly influenced to the defendant's detriment," reversal is required regardless of whether the court is convinced an unbiased jury would have reached the same result. (People v. Marshall, supra, at p. 951; see In re Carpenter, supra, at pp. 651, 654; In re Malone (1996) 12 Cal.4th 935, 964 [50 Cal.Rptr.2d 281, 911 P.2d 468].)[4]
On appeal from a ruling denying a new trial motion based on juror misconduct, we defer to the trial court's factual findings if supported by substantial evidence, and exercise our independent judgment on the issue of whether prejudice arose from the misconduct (i.e., whether there is a substantial likelihood of inherent and/or circumstantial juror bias). (People v. Nesler, supra, 16 Cal.4th at p. 582 & fn. 5; see People v. Ault (2004) 33 Cal.4th 1250, 1263-1264 [17 Cal.Rptr.3d 302, 95 P.3d 523].)

C. Analysis

The Attorney General concedes the juror's conversations with the nonjuror constituted misconduct, and thus a presumption of prejudice arose. Accordingly, the issue before us is whether the presumption of prejudice has been rebutted.
Preliminarily, we note that contrary to the Attorney General's assertion that we must defer to the trial court's factual finding that Juror D. was not biased against defendant if supported by substantial evidence, a trial court's finding of no prejudice must be reviewed independently on appeal. (People v. Nesler, supra, 16 Cal.4th at p. 582 & fn. 5; People v. Ault, supra, 33 Cal.4th at pp. 1263-1264.) As explained in Nesler, the appellate "court must independently determine whether, from the nature of [the] misconduct and all the surrounding circumstances, there is a substantial likelihood [the juror] *489 was . . . biased, i.e., was unable to put aside her impressions or opinions based upon the extrajudicial information she received and to render a verdict based solely upon the evidence received at trial."[5] (Nesler, supra, at pp. 582-583.)
Here, there were no conflicts in the descriptions of juror misconduct that were resolved by the trial court. (Cf. In re Carpenter, supra, 9 Cal.4th at p. 646; People v. Loker, supra, 44 Cal.4th at p. 749.) The trial court accepted the facts set forth in the declarations submitted with the new trial motion, and then determined that under these undisputed facts the presumption of prejudice was rebutted. Although we defer to factual findings supported by substantial evidence, the legal import of the facts accepted by the trial court on the issue of prejudice is subject to our de novo evaluation. Accordingly, we independently review whether the record shows the presumption of prejudice was rebutted because there is no substantial likelihood of juror bias.
The juror misconduct at issue here was both pervasive (occurring every single day of the trial) and substantive (involving deliberative-type discussions about the merits of the case). The discussions between Juror D. and his friend not only violated Juror D.'s sworn obligation to follow the court's instructions not to discuss the case before deliberations and not to discuss the case at all with a nonjuror (Code Civ. Proc., § 232; Pen. Code, § 1122), but also contravened defendant's right to 12 jurors free from outside influence (see People v. Pierce, supra, 24 Cal.3d at p. 207; People v. Wilson, supra, 44 Cal.4th at p. 838). The nature of this misconduct gives rise to serious questions concerning the fairness of the trial.
(5) First, Juror D.'s failure to comply with repeated admonitions not to discuss the case casts serious doubts on his willingness to follow the court's other instructions. (See In re Hitchings (1993) 6 Cal.4th 97, 120 [24 Cal.Rptr.2d 74, 860 P.2d 466] ["`When a person violates his oath as a juror, doubt is cast on that person's ability to otherwise perform his duties.'"]; People v. Leonard (2007) 40 Cal.4th 1370, 1411 [58 Cal.Rptr.3d 368, 157 P.3d 973].) The court repeatedly reminded the jurors that they were under an absolute obligation not to discuss the case with a nonjuror and emphasized that this was a critical component of a fair trial.[6] Juror D. disregarded this obligation and engaged in ongoing discussions with his nonjuror friend about the case.
*490 (6) This is not a case where a juror inadvertently or briefly mentioned something about the case to an outsider. (See, e.g., People v. Danks, supra, 32 Cal.4th at pp. 307, 310 [no prejudice from brief conversations between jurors and pastors]; People v. Zapien (1993) 4 Cal.4th 929, 994 [17 Cal.Rptr.2d 122, 846 P.2d 704] [no prejudice from juror's inadvertent exposure to outside material concerning case].) Juror D.'s intentional and persistent disregard of the court's instruction not to discuss the caseand in particular not to discuss the case with a nonjurorcreates a substantial likelihood that he also gave short shrift to his duty to follow the court's other instructions. Jury adherence to the trial court's instructionswhich cover such matters as the burden of proof, the presumption of innocence, the elements of the crime, and the evaluation of witness credibilityis essential to a fair trial. Although we typically presume that jurors follow the court's instructions (People v. Gray (2005) 37 Cal.4th 168, 217 [33 Cal.Rptr.3d 451, 118 P.3d 496]), we cannot do so here in the face of the undisputed showing that Juror D. flagrantly disregarded an instruction that he was repeatedly told was essential to the fairness of the trial.
Second, the ongoing and improper communications between the juror and nonjuror about the merits of the case fundamentally compromised the integrity of the jury's deliberative process and undermined the requirement that the jury alone determine whether a defendant is guilty. The conversations between Juror D. and his friend included discussions about whether the victim had a motive to falsely accuse defendant; the implications to be drawn from the fact that defendant would not likely be testifying; their respective views as to which party was prevailing or should prevail; and the juror's observations concerning the victim's demeanor. The declarations reveal that G. freely shared his opinions with Juror D. about how to evaluate the case, improperly interjecting his views into Juror D.'s consideration of the evidence. These discussions were akin to deliberations that occur in the jury room and violated the constitutional requirement that the case is to be considered and decided solely by the sworn jurors. (People v. Bradford, supra, 154 Cal.App.4th at pp. 1413-1414.)
Unbeknownst to the prosecutor, defense counsel, and the court, G. was, in effect, a 13th juror who had not undergone the voir dire process to uncover bias. As recognized in People v. Wilson, supra, 44 Cal.4th at page 822, "the *491 pretrial voir dire process is important [to protect the constitutional right to an impartial jury] because it enables the trial court and the parties to determine whether a prospective juror is unbiased and both can and will follow the law." Further, G. had not been sworn to try the case on the evidence and instructions, nor had he been present each day of trial to hear the evidence, evaluate witness demeanor, and apply his observations to the controlling law set forth by the court in the instructions. Each of these steps is essential to preserve the defendant's constitutional right to an impartial jury that decides the case on the evidence and under the court's instructions. Defendant was entitled to have his case evaluated by 12 jurors, not by 12 jurors and one extra, "invisible," unsworn juror whom Juror D. consulted on a daily basis.
The misconduct arising from these daily, deliberative-type discussions improperly interjected the views of a nonjurorwho had not been vetted through voir dire, had not been sworn to follow the law, and had not heard all the evidenceinto Juror D.'s consideration of the case. Although Juror D. did not advise his fellow jurors of his communications with his friend, the fact that one juror was improperly influenced deprived defendant of his constitutional right to be tried by 12 impartial jurors. (See People v. Nesler, supra, 16 Cal.4th at p. 578.)
(7) Third, the fact that Juror D. and G. discussed the import of defendant's decision not to testify demonstrates that this outside influence was directed to a critical issue and one that was potentially highly detrimental to the defense.[7] As is true in all criminal trials, the jury was instructed that it is not permitted to consider or discuss the fact that defendant exercised his constitutional right not to testify. (See CALCRIM No. 355.)[8] This rule is designed to prevent the jury from drawing adverse inferences against the defendant in violation of the constitutional right not to incriminate oneself. (People v. Leonard, supra, 40 Cal.4th at pp. 1424-1425.) In some cases the courts have found comments about a defendant's failure to testify to be nonprejudicial misconduct. (See, e.g., People v. Hord (1993) 15 Cal.App.4th 711, 726-728 [19 Cal.Rptr.2d 55] [no prejudicial misconduct from jurors' mere mentioning of defendant's failure to testify; comments were transitory without further discussion and foreperson admonished jurors they could not *492 consider the failure to testify]; People v. Leonard, supra, 40 Cal.4th at p. 1425 [no prejudicial misconduct from jurors' comments at penalty phase that they wished defendant had testified to assist them better in understanding him; comments were not akin to negative inferences from failure to testify]; People v. Loker, supra, 44 Cal.4th at pp. 748-749 [no prejudicial misconduct from jurors' mentioning of defendant's failure to testify during penalty phase; comments were brief and foreperson admonished jurors not to consider this matter].)
(8) Unlike the situations in Hord, Leonard and Loker, the circumstances of this case show the discussion of defendant's decision not to testify carried a high potential of prejudice to the defense. In the absence of physical evidence, sexual molestation cases inevitably turn largely on the jury's evaluation of the victim's credibility. A defendant is entitled to have all 12 jurors make this evaluation without considering whether the defendant took the stand to deny the accusations. The defendant's silence should not be a factor adding to any inferences that the victim is telling the truth. The fact that Juror D. discussed defendant's silence with G. reflects that Juror D. considered this factor. Further, the fact that Juror D. repeatedly ignored clear instructions not to discuss the case supports that he equally ignored the court's instruction not to factor in defendant's silence when deciding the case. This improper influence obviated defendant's constitutional right not to have his silence play any role in his conviction.
(9) Juror D. and G. also had discussions concerning whether the victim had a motive to falsely accuse defendant. G. declared that he told Juror D. that unless S. had a motive to make a false accusation, defendant was guilty. Assuming Juror D. heard this statement, this raises further concerns that G. was providing Juror D. with inaccurate summations of the law.[9] An absolute statement that a defendant is guilty unless the victim has a motive to fabricate, contravenes the principle that the jury should consider all the evidence when determining whether guilt has been proven beyond a reasonable doubt. Contrary to G.'s statement, the absence of the victim's motive to lie, although relevant, is not necessarily determinative on the issue of guilt.
We are not persuaded that the presumption of prejudice was rebutted merely because G. ultimately opined to Juror D. that he thought there was insufficient evidence to support a guilty verdict. Regardless of G.'s eventual expression of an opinion favorable to the defense, the fact remains that during their conversations G. encouraged Juror D. to consider matters that were improper and detrimental to the defense, including the import of defendant's *493 decision not to testify and that defendant was guilty unless the victim had a motive to make a false accusation.
Contrary to the People's assertion, the circumstances of this case are not comparable to those in People v. Barton, supra, 37 Cal.App.4th 709, where the court found the improper influence was favorable to the defendants. In Barton, a juror and nonjuror (two of the defendants' uncle) had repeated contacts during which the nonjuror attempted to persuade the juror to vote not guilty by appealing to her sympathy, and during deliberations the juror made statements suggesting she was sympathetic to the defendants. Finding no prejudice, the Barton court reasoned that although the record showed the juror was impermissibly influenced by outside information, only the People, not the defendants, suffered detriment. (Id. at pp. 717-719.) The Barton case did not involve a nonjuror who actively and continually participated in the deliberative process with the juror, nor did it involve a discussion of matters detrimental to the defense.
(10) We conclude the record shows a substantial likelihood of juror bias. The content and frequency of the communications between Juror D. and his friend strongly suggest an outside influence detrimental to defendant that was tantamount to inherent bias. Even if the misconduct does not rise to the level of inherent bias, the totality of the circumstances show a substantial likelihood of actual bias. Juror bias exists if a juror is incapable or unwilling to decide the case solely on the evidence before him or her. (See In re Hamilton, supra, 20 Cal.4th at p. 294.) By discussing the merits of the case every single day with G., Juror D. engaged in conduct that persistently disregarded the court's instructions. Juror D.'s pervasive, deliberative-type communications with G. create a substantial likelihood that he was unwilling to decide the case solely on the evidence and instructions at trial. Also, because the discussions included matters that carried a high potential of detriment to the defense, there is a substantial probability that Juror D.'s impartiality towards defendant was compromised.
(11) Our Supreme Court has made clear that a guilty verdict based on the vote of even one biased juror cannot be sustained, regardless of whether an unbiased jury would have reached the same result. (In re Carpenter, supra, 9 Cal.4th at p. 654.) "A defendant is `entitled to be tried by 12, not 11, impartial and unprejudiced jurors. "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]'" (People v. Nesler, supra, 16 Cal.4th at p. 578, original brackets.) The record shows the sanctity of the deliberative process and the right to an impartial jury was prejudicially tainted by Juror D.'s misconduct. The presumption of prejudice has not been rebutted, and defendant is entitled to a new trial.

*494 II. Additional Issues upon Retrial

For guidance upon retrial, we address two other issues raised by defendant on appeal.

A. The Defense's Right to Examine the Victim's Diary

As set forth above, the prosecution introduced into evidence the portion of S.'s diary where she disclosed the molestation. Defendant asserts the trial court violated his due process rights by refusing his counsel's request to examine the entire diary. We conclude the defense should have been permitted to examine the entire diary, subject to appropriate protective orders formulated by the trial court.[10]

1. Background

The victim's diary was turned over to the police by S.'s parents during the investigation of the case. The diary contains entries dated between August 30, 2005, and April 23, 2006. To comply with its disclosure duties, the prosecution provided the defense with copies of the following portions of the diary: (1) The entry dated April 23, 2006 (consisting of 20 pages), which includes the statement disclosing the molestation; (2) an entry dated September 1, 2005 (consisting of four pages), which contains an admission that S. lied to her parents about a matter unrelated to the charges;[11] and (3) portions of entries dated November 19, 2005, January 8, 2006, and January 24, 2006, which include statements about visiting the grandparents' home. Citing the victim's privacy interests in the diary, the prosecution refused to disclose any other portions of the diary, explaining that they did not address anything related to the charges or defendant. The undisclosed portions of the diary included approximately 20 additional dated entries, covering about 102 additional pages.
Defendant filed a pretrial motion requesting that the court order the prosecution to turn over the entire diary for examination by the defense. Defendant argued the prosecution's intent to introduce into evidence the portion of the diary containing the disclosure waived the victim's privacy rights in the diary and, in the interests of fairness, required provision of the entire diary for defense inspection. The defense asserted that because the *495 diary entry was being used to support S.'s credibility, review of the entire diary by the defense was necessary to ascertain whether the veracity of that entry and S.'s credibility could be undermined by other portions of the diary. Opposing disclosure, the prosecution argued that provision of the entire 20-page, April 23 entry containing the disclosure provided the defense with the complete portion of the relevant material, and the remaining undisclosed portions of the diary were irrelevant.
After reviewing the entire diary in camera, the trial court denied defendant's pretrial motion for disclosure. The court recognized that under Brady[12] and California's discovery statute, defendant was entitled to the diary if it contained information material or relevant to the defense (§ 1054.1, subd. (c)), and that the fact the prosecution was introducing a portion of the diary entitled defendant to the entire diary if it was relevant to the portion that was being admitted (Evid. Code, § 356). However, the court concluded that the relevant portions of the diary had been turned over to the defense; the undisclosed portions were not relevant to the portion containing the disclosure; and there was no need for further disclosure.[13]
During trial, the court permitted defense access to portions of one additional diary entry (dated Apr. 15, 2006) which described sexual activity between S. and her boyfriend. The court permitted defense counsel to examine S. about this entry to support the defense theory that S. falsified the April 23 entry accusing defendant because she suspected her parents had read the April 15 entry and she was angry at them and wanted to hurt them.

2. Analysis

Defendant contends review of the entire diary is necessary to determine whether there were matters favorable to the defense, such as S.'s lack of entries complaining about the molestation, S.'s lack of expression of anger at defendant, or S.'s tendency to fantasize or exaggerate.
(12) As a matter of constitutional due process, a defendant has a right to receive all material, exculpatory and impeachment evidence in the possession of the government. (Brady v. Maryland, supra, 373 U.S. at p. 87; People v. Salazar (2005) 35 Cal.4th 1031, 1042 [29 Cal.Rptr.3d 16, 112 P.3d 14].) Further, a defendant has a statutory right under the discovery statutes to disclosure of "[a]ll relevant real evidence" obtained by the prosecution during *496 its investigation and of relevant written or recorded statements made by prosecution witnesses. (§ 1054.1, subds. (c), (f); see People v. Gonzalez (2006) 38 Cal.4th 932, 960 [44 Cal.Rptr.3d 237, 135 P.3d 649]; Abatti v. Superior Court (2003) 112 Cal.App.4th 39, 53 [4 Cal.Rptr.3d 767].)
When a defendant makes a showing justifying review of materials in the government's possession to determine whether there is material favorable to the defense, and the requested materials are privileged or confidential, procedures have been adopted to balance the defendant's due process right to obtain relevant defense evidence with the privacy interests at stake. (See, e.g., Pennsylvania v. Ritchie (1987) 480 U.S. 39, 57-61 [94 L.Ed.2d 40, 107 S.Ct. 989]; Abatti v. Superior Court, supra, 112 Cal.App.4th at pp. 49-50.) For example, the court may conduct an in camera review of the items to determine whether they are material to the defense. (Pennsylvania v. Ritchie, supra, 480 U.S. at p. 60; see People v. Webb (1993) 6 Cal.4th 494, 518 [24 Cal.Rptr.2d 779, 862 P.2d 779]; People v. Navarro (2006) 138 Cal.App.4th 146, 170 [41 Cal.Rptr.3d 164]; Rubio v. Superior Court (1988) 202 Cal.App.3d 1343, 1350 [249 Cal.Rptr. 419].) In some instances, the balancing of the respective interests warrants exclusion of the defense from the in camera review. (See Pennsylvania v. Ritchie, supra, 480 U.S. at p. 60.) In other instances, the defense is permitted to participate in the review so as to subject it to the adversarial process, while allowing the issuance of appropriate protective orders to ensure maintenance of privacy. (Dennis v. United States (1966) 384 U.S. 855, 874-875 [16 L.Ed.2d 973, 86 S.Ct. 1840]; see U.S. v. Singh (5th Cir. 1991) 922 F.2d 1169, 1172-1173).
(13) The exclusion of the defense from review of the materials is justified when the state has a compelling interest in maintaining the privacy of the materials. (Pennsylvania v. Ritchie, supra, 480 U.S. at pp. 59-61 [only trial court permitted to review child abuse records for information material to defense].) In Ritchie, the court recognized that precluding defense counsel from examining the state's child abuse files denied the defendant "the benefits of an `advocate's eye,'" but reasoned the state had a compelling interest in protecting its child abuse information and in camera review by the trial court was sufficient to protect the defendant's right to discover favorable evidence. (Ibid.)
In contrast, when there is no compelling need to maintain the privacy of the materials or the privacy interests may be adequately protected through orders restricting disclosure, the review should be conducted with defense participation. (See Dennis v. United States, supra, 384 U.S. at pp. 872-875.) *497 In Dennis, the court concluded defense counsel should be permitted to review grand jury testimony for potential impeachment evidence at trial under circumstances where the court had the authority to order disclosure and the state conceded the need to preserve the secrecy of the grand jury testimony was now minimal. (Id. at pp. 869-874.) The Dennis court explained that it was not realistic "to assume that the trial court's judgment as to the utility of material for impeachment . . . purposes, however conscientiously made, would exhaust the possibilities. In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate." (Id. at pp. 874-875.)
(14) The circumstances of this case do not involve simply a defense request to review material in the prosecution's possession, but rather involve a defense request to review materials that the prosecution is introducing into evidence. The introduction of evidence derived from private materials can waive the privacy rights in the materials. (See People v. Ledesma (2006) 39 Cal.4th 641, 695 [47 Cal.Rptr.3d 326, 140 P.3d 657]; People v. Clark (1993) 5 Cal.4th 950, 1005-1008 [22 Cal.Rptr.2d 689, 857 P.2d 1099], disapproved on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11]; United States v. Nobles (1975) 422 U.S. 225, 239-240 [45 L.Ed.2d 141, 95 S.Ct. 2160].) Additionally, the introduction of a portion of a statement can support an opponent's introduction of the entire statement. (People v. Harris (2005) 37 Cal.4th 310, 334-335 [33 Cal.Rptr.3d 509, 118 P.3d 545]; Evid. Code, § 356.)
The rule permitting access to private materials when the opposing party uses the materials at trial is designed to prevent the unfairness which would arise if one party is allowed to make "unilateral testimonial use" of private materials. (United States v. Nobles, supra, 422 U.S. at pp. 239-240.) Similarly, the rule permitting introduction of an entire statement when a portion of the statement is introduced by an opposing party prevents the jury from obtaining a misleading impression from the statement in isolation and allows the jury to place the statement in context to evaluate its meaning. (People v. Arias (1996) 13 Cal.4th 92, 156 [51 Cal.Rptr.2d 770, 913 P.2d 980].)
Here, S.'s parents turned the diary over to the authorities and a portion of the diary was admitted into evidence by the prosecution. Although a diary may be afforded privacy protection (see Taus v. Loftus (2007) 40 Cal.4th 683, 734 [54 Cal.Rptr.3d 775, 151 P.3d 1185]), the prosecution's use of a portion of the diary reflects a waiver of that privacy interest sufficient to permit review by the defense. The People have not identified any compelling interest in shielding the diary from examination by the defense. Notably, the defense *498 is not seeking a "fishing expedition" in documents in the government's possession, but is merely seeking access to materials used by the prosecution at trial. The courts recognize that a trial court's in camera review is not a full substitute for review by an advocate; thus, there must be some justification to foreclose the latter. No such justification has been presented here. The appropriate balancing of the parties' respective interests warrants providing the defense with access to the diary for purposes of reviewing it for material relevant to the defense, subject to appropriate protective orders fashioned by the trial court to maintain S.'s privacy.
The Attorney General asserts that the trial court was precluded from ordering the prosecution to provide defense access to the entire diary because, based on the prosecution's and the trial court's review, the undisclosed portions of the diary were determined to be irrelevant, and the prosecution has no duty to turn over irrelevant evidence. The contention is unavailing. As stated, under the circumstances of this case there is no justification for precluding the defense from reviewing the diary to assess relevancy.
Our holding is not meant to suggest any opinion about the admissibility of any portions of the diary. We merely hold that the defense has the right to inspect the entire diary, subject to appropriate protective orders to protect S.'s privacy, and to present argument to the trial court on the issue of relevancy.

B. No Constitutional Requirement of Unanimity for Acts Constituting Continuous Sexual Abuse

(15) Defendant contends the trial court violated his constitutional rights by failing to give a unanimity instruction for the count 1 offense of continuous sexual abuse of a child under age 14. (§ 288.5.) Section 288.5, subdivision (a) defines the offense as committed when the defendant engages in three or more acts of substantial sexual conduct or lewd acts with the child over at least a three-month period. Section 288.5, subdivision (b) dispenses with the need for the jury to unanimously agree on the same three acts, stating: "To convict under this section the trier of fact, if a jury, need unanimously agree only that the requisite number of acts occurred not on which acts constitute the requisite number." Challenging this provision, defendant contends he is constitutionality entitled to a unanimous jury determination on each act that establishes the section 288.5 violation.
As recognized by defendant, in People v. Gear (1993) 19 Cal.App.4th 86, 89 [23 Cal.Rptr.2d 261], this court rejected a constitutional challenge to section 288.5, subdivision (b). In Gear, we explained: "The general rule is *499 that the jury must unanimously `agree upon the commission of the same act in order to convict a defendant of a charged offense.'. . . . [¶] This fundamental rule has presented vexing proof problems in cases involving . . . persons who reside with a minor or have unchecked access to a minor and are charged with repeatedly sexually molesting the minor over a prolonged period of time. . . . [¶] Section 288.5, creating the new crime of continuous sexual abuse of a child, was the Legislature's response . . . . [¶] . . . [¶] The crime of continuous sexual abuse of a child (§ 288.5) is a continuous-course-of-conduct crime and therefore falls within the exception to the rule that jurors must agree on the particular criminal acts committed by the defendant before convicting him." (People v. Gear, supra, at pp. 90-92, citation omitted.) The continuous-course-of-conduct exception to the unanimity requirement applies when, as here, the statute contemplates a continuous series of acts over a period of time. (Id. at pp. 91-92.) There is no violation of the constitutional right to unanimous agreement on the criminal conduct because the actus reus of the offense is the course of conduct, not a specific act. (Id. at pp. 92-93.) "`The agreement required for conviction is directed at the appropriate actus reus: unanimous assent that the defendant engaged in the criminal course of conduct.'" (Id. at p. 93; accord, People v. Whitham (1995) 38 Cal.App.4th 1282, 1295-1298 [45 Cal.Rptr.2d 571].)
To support his constitutional challenge to section 288.5, defendant cites People v. Jones (1990) 51 Cal.3d 294 [270 Cal.Rptr. 611, 792 P.2d 643], a case which concerns the section 288 lewd conduct offense. As we stated in Gear, reliance on Jones's analysis to evaluate section 288.5 is "akin to comparing apples with oranges." (People v. Gear, supra, 19 Cal.App.4th at p. 93.) The defendant in Jones was charged with several counts of lewd conduct on a minor (§ 288, subd. (a)) committed during various time periods, and the charges were supported by "generic" testimony from the child that did not distinguish between the individual acts occurring over an extended period of time. (People v. Jones, supra, at pp. 299-300, 321.) The Jones court overruled several appellate court decisions that had found such generic testimony violated the defendant's right to a unanimous jury verdict because it would be impossible for the jury to agree on specific acts that constituted the crime. (Id. at pp. 299-300, 308-309, 322.) The Jones court concluded that there was no constitutional impediment to allowing a jury to find a defendant guilty of more than one indistinguishable act as long as the victim's testimony described the nature of the sexual acts, the frequency of the acts, and the general time period for the acts. (Id. at pp. 316, 321.) Further, the court in Jones directed that the jury be given a modified unanimity instruction, stating: "[W]hen there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity *500 instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." (Id. at p. 322.)
(16) Because Jones does not concern the continuous-course-of-conduct offense defined by the Legislature in section 288.5, its directive that the jury must unanimously agree that the defendant committed all the acts described by the victim does not apply to this section.[14] Unlike the section 288 offense at issue in Jones, section 288.5 contains specific requirements that define its parameters, including the requirement of three predicate acts over a three-month time period, and a limitation of one count per victim under the section. (See People v. Jones, supra, 51 Cal.3d at p. 329 (dis. opn. of Mosk, J.) ["The Legislature, in enacting section 288.5, created several safeguards designed to balance the state's compelling interest in prosecuting the resident child molester with the protection of a criminal defendant's rights."].) There is nothing in Jones that suggests the Legislature's decision to dispense with the unanimity requirement for the three predicate acts is unconstitutional, or that there is a constitutional imperative that the modified unanimity requirement formulated in Jones must be imposed on a section 288.5 offense. (People v. Higgins (1992) 9 Cal.App.4th 294, 300-301, 304-305 [11 Cal.Rptr.2d 694]; People v. Gear, supra, 19 Cal.App.4th at pp. 93-94.)
(17) We are likewise unpersuaded by defendant's contention that the United States Supreme Court's holding in Richardson v. United States (1999) 526 U.S. 813 [143 L.Ed.2d 985, 119 S.Ct. 1707] supports that section 288.5, subdivision (b) is unconstitutional. In Richardson, the court, as a matter of statutory interpretation, concluded that a federal offense requiring a series of drug offenses to prove a continuing criminal enterprise required unanimous agreement as to which three specific drug transactions supported the conviction. (Richardson, supra, 526 U.S. at pp. 815-818.) In reaching this conclusion, Richardson noted that "the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition." (Id. at p. 820.) However, citing and distinguishing the Gear decision, the Richardson court recognized that this constitutional concern did not necessarily apply to state statutes that involved difficult problems of proof. Richardson noted that state statutes that permit conviction for sexual abuse of a minor based on a continuous course of conduct "may well respond to special difficulties of proving underlying *501 criminal acts, People v. Gear, supra, [19 Cal.App.4th] at [pp.] 90-92, . . . . which difficulties are absent here." (Id. at p. 821.) Thus, Richardson supports the constitutionality of the continuous-course-of-conduct exception applied by the Legislature in section 288.5, subdivision (b). (See State v. Sleeper (2004) 150 N.H. 725 [846 A.2d 545, 548-550] [Richardson does not invalidate state's continuous-course-of-conduct sexual abuse offense]; State v. Johnson (2001) 243 Wis.2d 365 [627 N.W.2d 455, 462-464] [same].)
(18) To the extent defendant suggests the continuous-course-of-conduct exception runs afoul of the Apprendi[15] rule, the contention fails. The Apprendi rule requires that each element of the offense be found by the jury beyond a reasonable doubt, and prohibits a state from circumventing this rule by reclassifying elements of an offense as sentencing factors to be determined by a judge. (Apprendi v. New Jersey, supra, 530 U.S. at pp. 477, 491-496.) Defendant has not cited any authority suggesting that the Apprendi rule is violated when the state, because of unique problems of proof, classifies a continuous course of conduct as the element of the offense which must be found by a unanimous jury, while classifying the specific underlying acts as the means of committing the crime which need not be found by a unanimous jury. (See People v. Napoles (2002) 104 Cal.App.4th 108, 116 [127 Cal.Rptr.2d 777] [no unanimity instruction required regarding "`the exact way the defendant is guilty of a single discrete crime'"].) Section 288.5 permissibly defines the operative element as a continuous course of at least three acts, and defines the three specific acts as the means of committing the crime. (People v. Higgins, supra, 9 Cal.App.4th at p. 307 ["the number of acts of molestation is an essential element of the crime; unanimity on which acts . . . is not"].) This does not constitute a violation of the Apprendi rule.

III. Remaining Issues

Defendant raises several additional assertions of reversible error, including that (1) A second juror committed misconduct by referring to her expertise during deliberations; (2) the trial court erred in excluding evidence of S.'s complaint to her parents about a neighbor touching her; (3) the trial court erred in excluding negative character evidence derived from S.'s statements on Internet "My Space" pages; and (4) the prosecutor's closing arguments were improper. Given our reversal of the judgment, we need not address these issues. If the evidentiary disputes recur, they should be resolved in the first instance by the trial court based on the party's presentations at that time.

*502 DISPOSITION
The judgment is reversed.
McConnell, P. J., and Irion, J., concurred.
NOTES
[1] Subsequent unspecified statutory references are to the Penal Code.
[2] To preserve privacy, we refer to various persons involved in this case by their first initials.
[3] Trial testimony was presented over a period of about four and one-half days, and the jury deliberated for about two days.
[4] In Carpenter, the Supreme Court clarified that the strength of the prosecution's evidence may be examined to determine the likelihood of juror bias, but once actual bias has been found the judgment must be reversed regardless of the strength of the evidence. (In re Carpenter, supra, 9 Cal.4th at p. 655.)
[5] In contrast, when a trial court grants a new trial based on a finding of prejudice from juror misconduct, the ruling granting a new trial is subject to deference on appeal with no independent review. (People v. Ault, supra, 33 Cal.4th at p. 1265.)
[6] For example, the court variously stated: "For the time that you're jurors, you have an obligation not to talk about this case or anything related to this case. It's part of the process of trying to keep a fair jury." "I've discussedand will discuss again and again and againthat you can't talk about the case, you can't form or express opinions about it." "Throughout the course of this trial, we have to keep a glass wall around you." "I'm just going over this to belabor againand I will do that regularly each dayhow important it is for you not to talk about the case. . . . [¶] . . . They're key ingredients of your being fair . . . ." "So folks are going to be curious about what you're doing. They'll be asking questions one way or the other expressly, silently. You're going to feel the instinctI guaranteeto talk about it, and I'm reminding you that you must not." "[T]he opportunities for you to talk about this case, you must not accept."
[7] G.'s declaration states that he told Juror D. that guilty people do not testify, whereas Juror D.'s declaration merely refers to his (Juror D.'s) statement that he did not think defendant would testify and G.'s response that certain high-profile defendants who did not testify were acquitted even though they were guilty. Regardless of the precise nature of their discussion, it is clear they discussed defendant's decision not to testify.
[8] In the language of CALCRIM No. 355, the jury was instructed: "A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way" (Italics added.)
[9] Juror D.'s declaration refers to a discussion of S.'s possible motives to lie, but does not refer to a precise statement by G. that defendant was guilty unless S. had a motive to lie.
[10] Defendant filed a motion on appeal requesting that his appellate counsel be permitted to review the sealed diary and a sealed reporter's transcript concerning the trial court's in camera examination of the diary. Given our resolution of the case, the motion is moot.
[11] In this diary entry, S. stated that she falsely told her parents she sprained her wrist when she tripped over a curb while running, because she did not want to tell them she was riding a skateboard without a helmet.
[12] Brady v. Maryland (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194].
[13] Defendant moved to review the entire diary before the first and second trials and in a new trial motion after the second trial. The trial court denied his requests in all instances. At the time of the first trial, defendant also unsuccessfully sought writ relief for defense access to the diary from this appellate court.
[14] The Jones court acknowledged that the Legislature had recently enacted section 288.5, and merely noted that the section could face a due process challenge if the appellate court decisions (disapproved in Jones) were valid. (People v. Jones, supra, 51 Cal.3d at pp. 310-311.)
[15] Apprendi v. New Jersey (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348].