[No. B079114. Second Dist., Div. Seven. Aug. 8, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
KEITH EUGENE BARTON et al., Defendants and Appellants.

COUNSEL

Howard J. Specter, William D. Farber and William Flenniken, Jr., under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Sharon Wooden Richard and Richard B. Cullather, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—During the trial of four defendants for the attempted murder of a police officer, a juror committed misconduct by having repeated contact with the uncle of two defendants. After a hearing, the trial court denied new trial motions finding the presumption of prejudice had been rebutted. We affirm the judgments.[1]

### FACTUAL AND PROCEDURAL BACKGROUND

Because the only issues involve juror misconduct—not insufficiency of the evidence or errant evidentiary rulings—the crime facts may be stated simply. Our perspective favors the judgment. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110].)

On December 3, 1992, at 11 p.m., Pomona Police Officer Roger Iwig was in full uniform on patrol in a marked black and white police car when he saw a blue minivan run a stop sign.[2] Based on his observation and a radio call from Officer Duane Leonard, who was in a nearby patrol vehicle and also saw the traffic violation, Officer Iwig decided to stop the van and issue a traffic citation. He sped up and activated his high beams.

Through the rear window of the minivan he saw three people. Appellant Keith Eugene Barton was the driver, appellant Bobby Maurice Tillman the right front passenger, and appellant Warren a rear passenger. Both Tillman and Warren turned and looked at Officer Iwig.

When the minivan moved to the curb lane, Officer Iwig believed it would pull over, so he switched off his high beams. But the minivan did not pull over. Again, Warren looked toward Officer Iwig. The driver (Barton) and Tillman looked at each other and then looked back toward Warren.

At an intersection, Officer Iwig activated his high beams and his red light. Officer Leonard's patrol car was behind him.

Soon, the minivan slowed and started to pull over. As it slowed, the right passenger door and rear door opened. Tillman and Warren jumped out and began shooting at Officer Iwig—Tillman with an AK-47 assault rifle and Warren with a handgun.

Officer Iwig ducked onto the front seat as seven bullets struck his car; four hit the windshield, the other three struck the grill, hood, and lightbar. Still

---

[1]We correct the clerical errors in the Andre LaJuan Warren abstract of judgment.

[2]The van belonged to Nathaniel Staples, who had loaned it to appellant Warren the day before.

half lying on the front seat, Officer Iwig radioed for help, put his car in gear, made a U-turn, and drove about 30 yards where he stopped behind a furniture store.

Officer Leonard had just stopped behind Officer Iwig when the shooting started. He saw someone firing at Officer Iwig from inside the minivan. The minivan's rear window shattered. Officer Leonard took cover behind the door of his patrol car and fired at the minivan three times with his .45-caliber service revolver. When Officer Leonard began firing, Warren and Tillman ran away. Then the minivan drove south and turned west, with Officer Leonard in pursuit.

After driving about one block, the minivan crashed into a curb and the driver, Barton, and another Black man (codefendant Gregory Dion Jackson) jumped out and fled. An AR-15 assault rifle was later found inside the minivan.

A few minutes after the shooting Tillman, now shirtless, was arrested. His shirt and black jacket were recovered two blocks away.

Not far from Tillman's place of arrest, Warren—who was trotting on the sidewalk—was arrested.

About an hour later Barton and Jackson were arrested hiding under a trailer.

Jackson and Tillman were brothers, and all four arrestees were members of the 357 Crips Gang. All four tested positive in a gunshot residue test.

Warren's fingerprint was found on the passenger door window of the minivan.

The only defendant who testified was Barton. He admitted being in the minivan with the three defendants but claimed to have been lying down because he had a "PCP" headache. When he heard someone say the police were following them and the minivan might be stolen he jumped out, ran, and hid.

Appellants Barton, Tillman, and Warren, and codefendant Jackson, were charged with attempted willful, deliberate, premeditated murder (Pen. Code,[3] §§ 664/187), conspiracy to commit murder (§§ 182, 187), and two counts of

---

[3]Statutory references, unless otherwise noted, are to the Penal Code.

assault (§§ 245, subd. (d)(3), 245, subd. (d)(1).[4] A jury convicted Barton, Tillman, and Warren of attempted murder and conspiracy to commit murder but were unable to make a finding on the willful, deliberate, and premeditated allegations. Tillman and Warren were also convicted of one assault against Officer Iwig (§ 245, subd. (d)(1); count V). Tillman was convicted of a second assault against Officer Iwig (§ 245, subd. (d)(3); count IV) but Warren was acquitted. Barton was acquitted of both assaults. All firearm allegations were found true. As to Warren it was also alleged he had suffered prior felony convictions and at the time of the offenses was on bail (§ 12022.1). These allegations were bifurcated and admitted.

As to codefendant Jackson the jury was unable to reach a verdict. He is not a party to this appeal.

Appellants all received state prison sentences.

## DISCUSSION

### 1. *Dictionaries in the jury room*

On Thursday, May 13, 1993, the jury, deliberating, had not yet arrived at any verdicts. They were excused at 4:30 p.m. and ordered to return on Monday, May 17, 1993.

On Friday, May 14, 1993, the court clerk found two dictionaries in the jury room, one with "Post-its" by the words "aid," "commission," "deliberate," and "principle."

On Monday, May 17, 1993, the trial court informed counsel. Appellants moved for a mistrial because the jury had received "extrinsic evidence." The trial court denied the motions.

The trial court brought the jury into the courtroom, advised them dictionaries had been found in the jury room and instructed them at length they were "to disregard anything that was contained in those dictionaries" and to rely only on the court's instructions. The court stated: "We want to ensure that these defendants are either acquitted or convicted of crimes by definitions that are used and have been applied to all persons who were similarly situated. If that necessitates undoing a verdict and reconsidering it, then you are to do so. But you are to ensure yourselves that the definition that you are concerned with [*sic*] is that definition contained in the instructions and not any other source."

---

[4]Tillman only was charged with assaulting Rutillio Torres (§ 245, subd. (a)(2); count III) but was found not guilty.

The next day, May 18, 1993, when the trial court received the attempted murder guilty verdicts, it asked each juror, as to each verdict, whether the verdicts were "based on legal definitions contained in the instructions and not from any other source." Each juror said yes.

■ It is misconduct for a jury "to obtain information from outside sources either as to factual matters or for guidance on the law." (*People* v. *Karis* (1988) 46 Cal.3d 612, 642 [250 Cal.Rptr. 659, 758 P.2d 1189].) ■ By consulting a dictionary the jury committed misconduct. ■ Jury misconduct raises a presumption of prejudice (*People* v. *Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Holloway* (1990) 50 Cal.3d 1098 [269 Cal.Rptr. 530, 790 P.2d 1327]) which, unless rebutted, entitles a defendant to a new trial. (*People* v. *Karis*, *supra*, 46 Cal.3d at p. 642.)

■ The trial court found the presumption of prejudice had been rebutted. We agree.

Prior to any verdicts, the trial court admonished the jury to disregard any dictionary definitions and to rely solely on its instructions. (*People* v. *Frank* (1990) 51 Cal.3d 718, 728 [274 Cal.Rptr. 372, 798 P.2d 1215].) Moreover, the trial court asked each juror, after receiving the attempted murder guilty verdicts, whether the verdicts were based upon definitions contained in its instructions and each juror said yes. In such circumstances the presumption of prejudice was rebutted. (See *People* v. *Harper* (1986) 186 Cal.App.3d 1420 [231 Cal.Rptr. 414]; *People* v. *Karis*, *supra*, 46 Cal.3d 612, 642-645; see generally, *People* v. *Cabrera* (1991) 230 Cal.App.3d 300 [281 Cal.Rptr. 238].)

2. *Request for jurors' names, addresses, and phone numbers*

■ The events which led to appellants' request for jurors' names, addresses, and phone numbers involved Carey Jackson, the uncle of defendant Jackson and appellant Tillman, and a 21-year-old first time juror, Monica Leonardi.

Carey Jackson was present during much of the trial and for that reason, as well as his being unusually tall and husky, was noticed by almost all the jurors.

At the end of a court day, shortly before deliberations began, Carey Jackson contacted Juror Monica Leonardi as she was driving home. Thereafter, through the end of the trial, they had repeated contact with each other,

often discussing the trial and the defendants. Juror Leonardi did not report these contacts.

On May 28, 1993, about 10 days after the end of trial, counsel for Tillman gave to the trial court an audiotape of a telephone conversation between Carey Jackson and Juror Leonardi. The tape was received and sealed.[5] On June 9, 1993, it was played for all counsel in open court. The tape, apparently secretly recorded by Carey Jackson, made clear that Juror Leonardi had committed misconduct by meeting with Carey Jackson and discussing the trial with him.

Defense counsel requested juror's names, addresses, and phone numbers in order to investigate jury misconduct. The court ordered points and authorities by June 16, 1993, and set a hearing on July 14, 1993.

After the July 14, 1993, hearing the trial court indicated that it would subpoena all the jurors, including Juror Leonardi, and question each in open court under oath. By implication, the request for juror's names, addresses, and phone numbers was denied.[6] Appellants contend the trial court erred. We disagree.

As *People* v. *Rhodes* (1989) 212 Cal.App.3d 541 [261 Cal.Rptr. 1] and *Jones* v. *Superior Court* (1994) 26 Cal.App.4th 1202 [31 Cal.Rptr.2d 890] make clear, decisional and statutory law "protect[] jurors from unwanted postverdict intrusions." (*Id.* at p. 1208.) Although a "defendant . . . may . . . *request* . . . personal juror information . . ." (Code Civ. Proc., § 206, subd. (f), italics added) he has no absolute right to such information. Absent a sufficient showing of good cause or need for the request, a trial court may properly deny the request. (*People* v. *Rhodes, supra,* 212 Cal.App.3d 541, 545; see also *Jones* v. *Superior Court, supra,* 26 Cal.App.4th 1202, 1208-1212; but see *People* v. *Simms*[7] (1994) 24 Cal.App.4th 462 [29 Cal.Rptr.2d 436].)

---

[5]The trial court retained it as court exhibit Z but did not consider its contents in ruling upon appellants' new trial motions. (See § 632, subd. (d).) It is not part of the record on appeal.

[6]Although we consider the matter as though there was such a motion which was denied, the record is less than clear. Counsel for Tillman began the hearing by stating, "At this time, your Honor . . . I am going to be requesting the court to conduct an inquiry of the other ten jurors, whether the court is going to release it to defense counsel to make inquiry."

At hearing's end, after the trial court had described its plan to subpoena and question all jurors, it invited comment from counsel. Counsel for Warren said, "I would heartily agree," and counsel for Barton and Tillman both only said, "Submit it, your Honor."

[7]Because the defendant in *Simms* clearly established good cause for the name and telephone number of a single juror, we regard much of the *Simms* discussion as dicta. Appellant Tillman relies on *People* v. *Scott** (Cal.App.) review granted September 29, 1994 (S041272); a decision vacated by Supreme Court review.

---

*Reporter's Note: Review dismissed as improvidently granted on February 15, 1996, and cause remanded to Court of Appeal, Second Appellate District, Division Four.

Here, although good cause was shown, the trial court obviated the need by subpoenaing 11 jurors (the 12th was on vacation and unavailable) and conducting a hearing where each was examined under oath.

Had the motion been granted there was no assurance that jurors, or any of them, would have consented to a defense interview. By its alternative, the trial court ensured that every juror[8] was available to defense counsel and subject to cross-examination under oath.[9]

We find no error.

### 3. *Juror misconduct, presumed prejudice, and prejudice rebutted*

On August 23 and 24, 1993, 11 jurors were questioned by the trial court and counsel. Based upon the misconduct of Juror Leonardi all appellants moved for a new trial. The trial court took the motion under submission. On August 26, 1993, the trial court found the presumption of prejudice had been rebutted and denied the new trial motions. Appellants claim error. We conclude the trial court's ruling was correct.

Prior to testifying, Juror Leonardi was given transactional immunity. We summarize her testimony.

Her first contact with Carey Jackson occurred near the end of trial and before deliberations began. She left the courthouse, went to the parking lot, got into her car, and started home. She noticed Carey Jackson following her in his red Corvette convertible. When she slowed to cross railroad tracks he drove alongside and spoke to her. She ignored him and drove home.

The next day, he again followed her from the parking lot and asked her to pull over. She did. He invited her for a drink at a nearby cafe and she accepted. They talked for 10 to 15 minutes in the cafe while she had a beer and he had 2. He told her he was related to two of the defendants, Tillman and Jackson. He didn't give her any information about the case but asked what she thought. While at the cafe she gave him her pager number.

Two days later he called her pager number and she returned his call. He invited her to his house and gave her directions. She agreed to come and gave him her home telephone number. She went home, got her gym equipment, and on the way to the gym stopped at his house. She stayed about 40

---

[8] The parties stipulated that the issue of juror misconduct could be decided based upon the testimony of the 11 jurors who testified.

[9] Initially, counsel were to put their questions to the trial court who, if they were appropriate, would then ask them. Soon, however, counsel directly cross-examined jurors.

minutes. He repeatedly stressed how young the defendants were and, without telling her how to vote, tried to persuade her to vote not guilty.

He also kissed her, asked about her sex life, and asked her to sleep with him. She said no.

After this visit they had several telephone conversations.

Juror Leonardi went to Carey Jackson's house a second time, apparently May 17, 1993,[10] after the conspiracy guilty verdicts but before the May 18, 1993, attempted murder guilty verdicts.

About five minutes after she arrived the phone rang. Carey Jackson activated his speaker phone and had her listen to part of a "three-way" conversation between a female, appellant Warren, and Carey Jackson. Warren talked about the conspiracy guilty verdict and said it carried a greater penalty than attempted murder. Carey Jackson switched the speaker phone off and on, and Juror Leonardi heard only about five minutes of the conversation.

Juror Leonardi testified: "I remember, I mean he kept bringing up the fact that they were young and that I would probably be sending some young people full of life to jail. You know, as a young person—I am not that old. I am only 21, you know—I tried to, you know, I did put myself in that position . . . ."

Carey Jackson told Juror Leonardi, "I hope you vote not guilty." She "didn't promise him that [she] would."

When asked about all the conversations she had had with Carey Jackson, Juror Leonardi said he "kept resisting me to vote one way. He didn't directly say vote this way. But he would try to make me vote a not guilty."

Although he was most interested in his nephews Tillman and Jackson, Carey Jackson never tried to influence her to convict the other defendants. He did try to influence her to acquit all four defendants. He stressed how young they were, that they had families, and that Tillman had a baby.

Carey Jackson did not ask Juror Leonardi for information about the case nor give her information about it, except once when he joked that he, not Barton, had been driving the minivan.

As to the other jurors, they were unaware Juror Leonardi had ever spoken to Carey Jackson. A few only knew he had tried to follow her once in his car but she had ignored him.

---

[10]She did not know the date but knew it was the evening "between" verdicts.

But Juror Yolanda Valdez testified that Monica Leonardi seemed very sympathetic to the defendants and even after the jury had reached a decision, she would challenge it, "[l]ike she was trying to get us to—well, like she didn't feel certain individuals were guilty."

Juror Jerome Pasternak testified that Juror Leonardi told the jury that she represented youth, "that she can feel things her way that may not be in agreement with the way we do it. In other words, she represented—she felt she represented the youth, very pointed statement and made sense at the time."

In reviewing the trial court's ruling we have the benefit of a record which is unusually detailed and clear. The trial court not only recounted the misconduct evidence and the presumption of prejudice that arose from it but explicated his "responsibility of determining whether the misconduct created a 'substantial likelihood that one or more jurors was impermissibly influenced to the defendant's detriment.'" That is the correct test (*People* v. *Marshall, supra,* 50 Cal.3d 907, 951) and the one we employ.

We agree with the trial court that although a juror "was impermissibly influenced," detriment was suffered not by any defendant but only by the People.[11] As the trial court stated: "The court finds that the only detriment experienced by the defendants was the denial of the benefits each defendant might have realized if the criminal conduct of Mr. Carey Jackson had come to fruition."

The trial court properly denied the new trial motions. (See generally, *People* v. *Miranda* (1987) 44 Cal.3d 57, 115-118 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Hill* (1992) 3 Cal.App.4th 16, 40 [4 Cal.Rptr.2d 258]; *In re Carpenter* (1995) 9 Cal.4th 634 [38 Cal.Rptr.2d 665, 889 P.2d 985].)

Appellant Warren notes, and respondent agrees, there are clerical errors in his abstract of judgment. We shall order the indicated corrections.

## DISPOSITION

Appellant Warren's abstract of judgment is ordered corrected as follows: the conviction of counts I and II shall show they were by jury trial (not by plea); it shall show his conviction on count V of Penal Code section 245,

---

[11]Despite substantial evidence, the jury split nine to three favoring a true finding the attempted murder had been willful, deliberate, and premeditated. Tillman was acquitted of the count III assault charge and Warren of the count IV assault charge. Barton was acquitted of two assault charges (counts IV and V). Jackson escaped conviction entirely, the jury being unable to reach any verdict as to him.

subdivision (d)(1) with a section 12022.5, subdivisions (a) and (d) enhancement found true; it shall show an upper eight-year term was imposed on count V, a consecutive five-year term on the section 12022.5 enhancement, and those count V sentences stayed pursuant to section 654. As corrected, the judgment is affirmed.

The judgments of appellants Barton and Tillman are affirmed.

Lillie, P. J., and Johnson, J., concurred.

Petitions for a rehearing were denied August 31, 1995, and appellants' petition for review by the Supreme Court was denied November 16, 1995. Mosk, J., was of the opinion that the petition should be granted.