Filed 2/18/15  P. v. Dave CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DARIANNE DAVE,<br><br>Defendant and Appellant. | F066869<br><br>(Super. Ct. Nos. BF136520C,<br>BF143949C)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

This is an appeal of two cases. Following a jury trial in Kern County Superior Court case No. BF136520C, appellant Darianne Dave was convicted of assault with force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(1))[1] (count 1); assault with a knife (§ 245, subd. (a)(1) (count 2); and misdemeanor brandishing a deadly weapon (§ 417, subd. (a) (count 4).[2] The jury found true the allegation that appellant personally used a knife in the commission of the assault (§ 12022, subd. (b)(1)).

On appeal appellant raises three issues. First, she claims prejudicial error occurred in her trial stemming from juror misconduct. Appellant asserts the misconduct caused either "inherent prejudice" or a "substantial likelihood" that actual juror bias resulted, requiring reversal of her convictions. Second, appellant contends the trial court committed prejudicial error when it permitted introduction of appellant's verbal statement made to one of the victims approximately one month before the assault occurred. Appellant argues her statement was "propensity evidence" and inadmissible. Finally, appellant seeks correction of the abstract of judgment for certain clerical errors.

We agree that the abstract of judgment contains clerical errors, which we order amended. We otherwise find appellant's arguments unpersuasive and affirm.

## FACTUAL BACKGROUND

Appellant's convictions stem from an April 14, 2011, assault on Eric Darwin (counts 1 and 2) and brandishing a knife at Julia McCaleb (count 4). Appellant's three

---

[1]     All future statutory references are to the Penal Code unless otherwise noted.

[2]     Appellant did not go to trial in the companion case, case No. BF143949C, but entered a plea of "no contest" to a single count as an accessory after the fact (§ 32). Appellant's only contention on appeal regarding case No. BF143949C is correction of the abstract of judgment, which we discuss in section III of the Discussion, *post*.

sons, A.R., Kendrick Parker, and Darian Parker,[3] participated with appellant in the assault on Darwin.   Appellant was tried concurrently with her sons Kendrick and Darian (who were both convicted of assault charges against Darwin) (collectively "the defendants").[4]

## 1.    Prior incidents.

Before the April 14, 2011, assault occurred, the defendants (along with A.R.) had various encounters with both Darwin and McCaleb.[5]   These prior encounters are relevant to our discussion and are briefly summarized below.

In January 2011, appellant's three sons were involved in a verbal and physical altercation with McCaleb at the defendants' home.  Appellant was not present during the January event.  The trial testimony was lengthy and conflicted greatly between the parties regarding who instigated the January altercation and who struck whom.  The prosecution attempted to show that appellant's sons, particularly Kendrick and A.R., instigated the January altercation, while the defense team attempted to show that Darwin was the instigator.

In March 2011, McCaleb was walking on the street when appellant drove up and parked next to her.  McCaleb referenced the January incident and asked appellant if she could "please tell her sons to leave us alone."  Appellant said she and her sons "don't talk, they fight[.]"  After McCaleb complained that appellant's sons "jumped" her in January, appellant replied, "Well, you know what?  You should have stayed in a woman's place."

---

[3]    For brevity, we will refer to Kendrick Parker and Darian Parker by their first names.  No disrespect is intended.

[4]    A.R. entered a plea of battery in the juvenile court for his involvement in the April 14, 2011, assault of Darwin.

[5]    Darwin and McCaleb have seven children together.

On April 13, 2011, Darwin and A.R. had a fist fight. Darwin knocked A.R. to the ground, claiming self-defense.

## 2. Prosecution's evidence regarding the April 14, 2011, assault.

The day after Darwin knocked A.R. to the ground, Darwin and McCaleb were walking down a street when a white van pulled up next to them and stopped. Appellant was driving. A.R. was the right front passenger, and he yelled out the window, "What's up now, nigger?"

Appellant, A.R., Kendrick and Darian exited the vehicle and attacked Darwin. While appellant's sons all punched Darwin, appellant approached with a six- or seven-inch knife and cut Darwin on his right wrist. Darwin did not see anyone with a knife during the attack, but he felt a sharp pain on his right wrist, which he attributed to a knife. Darwin fell to the ground and appellant's sons kicked him repeatedly. Darwin blacked out and lay motionless.

Appellant raised her knife at McCaleb and said, "This is because of you." Appellant and her sons fled.

Two independent witnesses saw portions of the attack.

Latoyia Fisher was driving past the incident and saw a group of males beating up another male. At trial she testified that the group was maybe "four or five black males" fighting the single male. She also testified that two females were near the incident but she did not see them do anything.

Jack Riley was also driving past the incident and saw three Black men kicking a male who was on the ground. He testified at trial that he saw two females near the incident, but they did not participate in the kicking.

Darwin was transported to the hospital. He suffered cut wounds to his right wrist.[6] His face was bloodied and beaten. As a result of the attack, Darwin lost strength in his right hand and can no longer do physical labor.

**3.      Appellant's evidence regarding the assault.**

The defendants did not testify at trial but A.R. provided testimony regarding what occurred on April 14, 2011. A.R. testified that neither his mother nor his brothers were present when the fight with Darwin took place on April 14, 2011. A.R. testified he knocked Darwin to the ground and kicked him until his mother drove up and ordered him to leave. A.R. testified that appellant never approached McCaleb or brandished a weapon.

## PROCEDURAL HISTORY

**1.      Case No. BF136520C.**

On February 17, 2012, the Kern County District Attorney's Office filed an information in case No. BF136520C charging appellant with two counts of violating section 245, subdivision (a)(1): to wit, assault with force likely to cause great bodily injury on Darwin (count 1) and assault with a knife on Darwin (count 2). It was further

---

[6]      In a footnote, appellant invites us to review Darwin's medical records admitted as defendant's trial exhibit A. Appellant argues the prosecution failed to introduce evidence that Darwin was medically diagnosed as suffering a stab wound and there "was apparently no diagnosis of a stab wound." These medical records, however, were not part of the record on appeal. The absence of a stab wound set forth in Darwin's medical records is of little consequence because the prosecution elicited testimony from McCaleb, Darwin, and City of Bakersfield Police Officer Daniel Brewer describing a "sliced" and/or "stab" wound to Darwin's right wrist. Based on this testimony, the prosecution submitted sufficient evidence to establish that Darwin suffered a "sliced" or "stab" wound. (*People v. Richardson* (2008) 43 Cal.4th 959, 1030-1031 [testimony of a single witness is sufficient for proof of any fact]; CALJIC No. 2.27.) Such evidence was proper lay opinion testimony based on the perception of these witnesses. (Evid. Code, § 800.) It was the domain of the jury to test the credibility of this evidence and resolve the factual dispute. (*People v. Estrella* (1995) 31 Cal.App.4th 716, 724-725.) Based on the verdicts rendered, the jury determined that appellant used a knife in the assault on Darwin.

alleged appellant violated section 417, subdivision (a), misdemeanor brandishing a deadly weapon (knife) at McCaleb (count 4). The information also alleged as to counts 1 and 2 that appellant had a prior serious felony conviction (§ 667, subd. (a)) and, as to count 2, appellant personally used a knife (§ 12022, subd. (b)(1)). Appellant pled not guilty and denied the special allegations.

## 2. Juror misconduct.

On November 13, 2012, jury trial commenced. On Monday, December 3, 2012, Juror No. 4 advised the trial court that Juror No. 1 told her that morning that Juror No. 1 had run into Darian's girlfriend in a grocery store the night before and they discussed the case. Darian's girlfriend conveyed to Juror No. 1 that Darian and his family were hoping "it would stop" because the defendants were facing long jail sentences and one of the defendants was currently in custody.

Juror No. 4 also relayed her observation that Juror No. 1 had spoken with members of the audience in the hallway, who might have been relatives, and she heard Juror No. 1 compliment another audience member about either her attire or her tattoos. Juror No. 4 believed that Juror No. 1 knew Darian based on statements Juror No. 1 had made.

Juror No. 4 said her conversation with Juror No. 1 would not affect her ability to be fair. After questioning Juror No. 4 about this issue, the trial court admonished her not to talk about this to anyone, including when the jury deliberated.

The court questioned Juror No. 1, who admitted she had discussed the case the night before with Darian's girlfriend, whom Juror No. 1 recognized as a spectator each day during trial. Juror No. 1 happened to go into the store where Darian's girlfriend worked without any knowledge she would be there. Darian's girlfriend told Juror No. 1 that she hoped the jurors made a "good decision" because the defendants were "not lying about anything" and the defendants were "not bad people." Juror No. 1 was told that "the

boys" could be sentenced for four years and appellant for 10 years, which Juror No. 1 found shocking.

Juror No. 1 informed the court that she had only spoken to Juror No. 4 about the matter. The court excused Juror No. 1 for cause. After discussions with all trial counsel, the court determined that Juror No. 4 would remain on the panel.

Anquanesha Porter was identified as Darian's girlfriend and the one who spoke with Juror No. 1. The court spoke with Porter and ordered her to remain away from the courthouse for the remainder of the trial, unless she had a personal need to be in court.

The court advised the jury panel that Juror No. 1 had been excused because she had contact with someone involved in the case, but it was not any of the defendants. The court admonished the jury that the defendants were not involved in the contact and the defendants were "not at fault in any fashion." When asked by the court, none of the remaining jurors indicated that they had either heard or were aware of any conversations that Juror No. 1 had about the case.

### 3. Appellant is found guilty and sentenced.

On December 5, 2012, the jury found appellant guilty on all counts and found true the knife-use allegation in count 2. Upon motion by the prosecutor, the court dismissed the prior strike allegation as to counts 1 and 2.

Appellant was sentenced to two years on count 2, plus an additional year for the knife-use enhancement, for an aggregate term of three years in state prison. The trial court also imposed a term of two years in state prison on count 1, but stayed the sentence pursuant to section 654. On count 4, the trial court imposed a term of 180 days in the county jail to be served concurrently to the sentence imposed on count 2.[7] The court also imposed various fees and fines.

---

[7]    Regarding case No. BF143949C, the Kern County District Attorney's Office filed an information on November 14, 2012, charging appellant with threatening to use force

7.

**4.      Motion for new trial based on jury misconduct.**

Upon completion of the trial, Kendrick's trial counsel filed a motion for new trial. Appellant's counsel joined the motion. The motion alleged that during deliberations Juror No. 4 had discussed with other jurors the circumstances surrounding Juror No. 1's dismissal.

In support of the motion, Kendrick's trial counsel submitted his own declaration stating he had interviewed five jurors after the verdicts were rendered. He stated that these five jurors had indicated that during deliberations the jurors discussed the dismissal of Juror No. 1. The jurors indicated that these discussions were brief but they also disclosed that Juror No. 1, prior to her dismissal, had discussed "with many" of them that she had prior knowledge of the defendants, she had "sworn to secrecy" on the matter, and she "'swore' to keep the secret that she knew the defendants." The jurors informed Kendrick's trial counsel that Juror No. 1 did not attempt to conceal her knowledge of the defendants and the defendants' families.

Also attached to the motion was Juror No. 12's declaration. Juror No. 12 stated that prior to deliberations, and before the trial concluded, he was unaware why Juror No. 1 was excused. During deliberations, Juror No. 4[8] explained to everyone why Juror No.

---

or violence upon McCaleb and Darwin because they provided assistance to law enforcement (§ 140) (count 1); and with dissuading a witness (§ 136.1, subd. (a)(1) (counts 2-4). It was further alleged as to each count that appellant committed the crimes while out on bail (§ 12022.1) and that she suffered a prior conviction (§§ 667, subds. (c)-(j), 1170.12, subds. (a)-(e)). Appellant pled not guilty and denied the special allegations. On February 25, 2013, the information was amended to add count 5, charging appellant as an accessory after the fact (§ 32), to which appellant pled no contest, and the prosecutor dismissed counts 1 through 4. The trial court sentenced appellant to a term of 16 months in state prison to be served concurrently to the sentence imposed in case No. BF136520C.

[8]      Juror No. 12 identified this juror as "juror number five" but this appears to be a scrivener's error as the record discloses it was Juror No. 4 who had this information.

1 had been released, explaining that Juror No. 1 "had been communicating with friends and/or relatives of the defendants." Juror No. 4 stated that Juror No. 1 had spoken to a "female acquaintance" of the defendants, who had been in the trial audience. Juror No. 4 disclosed that Juror No. 1 had known Darian, but she did not disclose that to the court during jury selection. Juror No. 4 also communicated that the person who spoke with Juror No. 1 had insisted that Juror No. 1 "swear to secrecy" her affiliation with or knowledge of the defendants and the defendants' family. Juror No. 12 stated that the jurors were never advised not to consider this matter during deliberations.

Based upon Juror No. 12's declaration, the trial court found that Juror No. 4[9] committed misconduct during deliberations because she violated the court's order not to discuss Juror No. 1's dismissal. The court noted that Juror No. 1's conduct created "an appearance of impropriety perpetrated at the bequest [*sic*] of the defendants in order to obtain an unfair trial." In making that finding, the court focused on the very vague reference to Juror No. 1 being "sworn to secrecy." The court, however, determined that nothing pointed to defendants as the reason for Juror No. 1's contact. Instead, the court found that the information provided to the other jurors only explained why Juror No. 1 was excused, and the court noted it advised the jurors that the defendants had no involvement or fault regarding this issue. The court concluded that nothing in the declarations showed any "negative light" cast on the defendants and there was no substantial likelihood of prejudice or bias against the defendants based on what the jurors discussed. Accordingly, the trial court denied the motion for new trial.

---

**9** The trial court incorrectly referred to Juror No. 4 and Juror No. 5, presumably because of the scrivener's error in Juror No. 12's declaration.

9.

**DISCUSSION**

**I.     Appellant Did Not Suffer Prejudice Or Bias As The Result Of Juror Misconduct.**

Appellant contends the jurors committed misconduct when they related outside information to the other jurors.  She asserts the juror misconduct created a presumption of prejudice which cannot be rebutted, arguing that the information "suggested that the defendants improperly tried to influence the jurors."  She maintains that her convictions should be reversed.

**A.     Standard of review.**

A criminal defendant is constitutionally entitled to trial before an impartial jury. (*People v. Hensley* (2014) 59 Cal.4th 788, 824.)  This requires a jury wherein no single member was improperly influenced and "'every member is "'capable and willing to decide the case solely on the evidence before it'"' [citations.]' [Citation]."  (*Ibid.*)

Evidence of a juror's thought process is inadmissible regarding whether misconduct occurred.  (Evid. Code, § 1150.)  Instead, objective evidence is used to determine if juror misconduct occurred based on "sight, hearing, and the other senses . . . subject to corroboration. [Citations.]"  (*People v. Hutchinson* (1969) 71 Cal.2d 342, 350.) A juror commits misconduct when he or she receives information outside the court about the pending case and discusses the case with nonjurors.  (*People v. Stewart* (2004) 33 Cal.4th 425, 510 (*Stewart*); *In re Carpenter* (1995) 9 Cal.4th 634, 647 (*Carpenter*).)

When juror misconduct is present, reversal of a criminal conviction is required if prejudice resulted.  (*Stewart, supra,* 33 Cal.4th at p. 510; *Carpenter, supra,* 9 Cal.4th at pp. 650-651.)  "[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial.  The verdict will be set aside only if there appears a substantial likelihood of juror bias.  Such bias can appear in two different ways.  First, we will find bias if the extraneous material, judged objectively, is inherently and

10.

substantially likely to have influenced the juror. [Citations.]  Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.]" (*Carpenter, supra,* 9 Cal.4th at. p. 653.)  We must set aside the judgment if we find prejudice under either test.  (*Ibid.*)

If the extraneous information was not inherently prejudicial, we examine the entire record to determine whether there is a substantial likelihood of actual bias.  (*Carpenter, supra,* 9 Cal.4th at p. 653.)  Our review includes "the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant."  (*Id.* at p. 654.)  Where the evidence of guilt is strong, it is less likely that the extraneous information itself influenced the verdict.  (*Ibid.*)

"Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination. [Citations.]"  (*People v. Nesler* (1997) 16 Cal.4th 561, 582.)

**B. Analysis.**

We initially examine the presence of jury bias under the first test, i.e., whether "the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.]"  (*Carpenter, supra,* 9 Cal.4th at p. 653.)  Appellant concedes, and we agree, that most of the extraneous information which Juror No. 1 received "was not inherently prejudicial."  Indeed, as appellant also concedes, most of this information was actually favorable to the defendants, who were described as "not lying about anything" and were "not bad people."

Appellant, however, argues that the situation was "inherently prejudicial" because someone "affiliated with the defendants" tried to influence Juror No. 1.  Appellant contends an unmistakable "inference of jury tampering" occurred when Darian's girlfriend told Juror No. 1 she hoped the jurors made a "good decision" and "swore" her

to secrecy. Appellant maintains that Juror No. 1 "apparently informed other jurors that she knew the defendants before trial" but failed to disclose that information during voir dire, arguing Juror No. 1 portrayed herself to other jurors "as being in cahoots with the defendants" and tried to insert "favorable bias" in the trial process.

The facts do not support appellant's argument that the circumstances were "inherently prejudicial" or that the "jurors would naturally assume" the defendants were somehow complicit with attempted jury tampering. Juror No. 1 stated she went into the store where Darian's girlfriend worked without any knowledge his girlfriend would be there. Juror No. 12 was told that Juror No. 1 had a conversation with "a friend or relative" of the defendants at a grocery store. This record does not demonstrate inherent prejudice based on Juror No. 1's encounter.

*People v. Barton* (1995) 37 Cal.App.4th 709 (*Barton*) supports our decision. In *Barton*, four defendants were charged with attempted willful, deliberate, premeditated murder, conspiracy to commit murder, and two counts of assault. (*Id.* at pp. 713-714.) An uncle of two of the defendants approached a juror and attempted to have an intimate relationship with her during trial, but she rejected his advances. (*Id.* at pp. 712, 717-718.) The juror, however, continued to meet with the uncle in person and spoke with him on the telephone during the course of the trial. (*Id.* at pp. 717-718.) During one of the initial conversations, the defendants' uncle "repeatedly stressed how young the defendants were and, without telling her how to vote, tried to persuade her to vote not guilty." (*Id.* at p. 718.)

During their meetings, the defendants' uncle did not ask the juror for information about the case and did not give her information, except once when he jokingly stated that he, and not one of the defendants, had been driving the vehicle in which the defendants committed the charged offenses. (*Barton, supra,* 37 Cal.App.4th at p. 718.) During deliberations, the juror appeared very sympathetic to the defendants' case. (*Id.* at p. 719.) One of the uncle's nephews was found guilty of attempted murder, conspiracy to commit

12.

murder, and assault, while the other nephew was found not guilty of all charges. (*Id.* at pp. 713, 714.)

On appeal, the *Barton* court determined that the juror "'was impermissibly influenced'" by the uncle's contacts but held that the defendants did not suffer any prejudice. (*Barton, supra,* 37 Cal.App.4th at p. 719.) The *Barton* court noted that the only detriment which the defendants experienced was the denial of those benefits that would have occurred had the uncle's efforts "'come to fruition.'" (*Ibid.*) As a result, the *Barton* court held the defendants were not entitled to a new trial. (*Ibid.*)

Here, like in *Barton,* Juror No. 1 was not asked for information about the case and she did not receive any information. Juror No. 1 did not impart any outside information about the case to the other jurors. As in *Barton*, Darian's girlfriend attempted to cast the defendants in a good light and she made an implied request for Juror No. 1 to vote not guilty. As the *Barton* court noted, the only prejudice which appellant experienced was a denial of those benefits that would have occurred had the girlfriend's efforts worked. The circumstances regarding how Juror No. 1 encountered Darian's girlfriend, or what they discussed, were not "inherently" prejudicial. (*People v. Nesler, supra,* 16 Cal.4th at p. 578; *Carpenter, supra,* 9 Cal.4th at p. 653.)

We next examine the second test, i.e., the nature of the misconduct and the surrounding circumstances to determine whether it was "substantially likely" that a juror was "actually biased" against appellant. (*Carpenter, supra,* 9 Cal.4th at p. 653.) The Supreme Court has held that extraneous information that is of a "'"'trifling nature'"'" does not require reversal of a criminal verdict. (*Stewart, supra,* 33 Cal.4th at p. 510, quoting *People v. Miranda* (1987) 44 Cal.3d 57, 118 (*Miranda*).) Moreover, there is no prejudice when the "'"'fairness of the trial'"'" could not have been affected by the extraneous information. (*Stewart, supra,* 33 Cal.4th at p. 510.)

In *Miranda, supra,* 44 Cal.3d 57, the Supreme Court found juror misconduct nonprejudicial and "trifling" when a juror approached the defendant's girlfriend (who

13.

attended the trial as a spectator) and, throughout the duration of trial, engaged in extensive conversations with her and displayed an obvious romantic interest. (*Miranda, supra,* 44 Cal.3d at pp. 115-116, 118.) The *Miranda* court dismissed any concerns that the contact created prejudice or an unfair trial because the contact did not involve any disclosure of information on matters pending in the case. (*Id.* at pp. 117-118.)

Likewise, in *Stewart, supra,* 33 Cal.4th 425, a juror in a capital murder case spoke to the defendant's former girlfriend. The conversation took place during a lunch break from trial and in a restroom. The former girlfriend had testified just prior to the break. (*Id.* at p. 509.) The juror said to the witness, "'[W]e're not suppose[d] to have any contact but I just wanted to tell you're a very nice looking (or attractive) lady.'" (*Id.* at p. 510.) The juror then exited the restroom. (*Ibid.*) On appeal, the *Stewart* court held a new trial was not warranted because the exchange was of "'"'"a trifling nature.'"'" (*Ibid.*) Although the juror committed misconduct, the exchange did not involve anything of substance concerning the case. (*Ibid.*)

Here, the extraneous information given to Juror No. 1 did not relate to anything of substance. The information was of "'"'"a trifling nature'"'" as it did not involve any disclosure of information regarding issues before the jury. (*Stewart, supra,* 33 Cal.4th at p. 510; *Miranda, supra,* 44 Cal.3d at pp. 117-118.) The information also did not call into question the defendants' character or cast them in a negative light. To the contrary, the information, as appellant concedes, was generally positive. The "'"'"fairness of the trial'"'" could not have been affected. (*Stewart, supra,* 33 Cal.4th at p. 510.) As such, the extraneous information was not "substantially likely" to have caused "actual bias" with a juror. (*Carpenter, supra,* 9 Cal.4th at p. 653.)

Further, although it is unclear what appellant means when she argues Juror No. 1's actions created "favorable bias" or how such "favorable bias" would require a new trial, the trial court adequately dealt with Juror No. 1 when it dismissed her for misconduct. (*People v. Ledesma* (2006) 39 Cal.4th 641, 743 [trial court properly dismissed juror who

14.

violated court order in discussing case with his wife].) Following her dismissal, the trial court properly admonished the jury that the defendants were not involved in Juror No. 1's contact and the defendants were "not at fault in any fashion." The trial court's instruction is a factor we examine to determine whether actual jury bias occurred. (*Carpenter, supra,* 9 Cal.4th at p. 654.) The trial court's admonition here counters against such a finding.

Appellant, however, argues that the court's instruction was inadequate and did not cure the likelihood of harm because the court failed to address that Juror No. 1 was "sworn to secrecy" and "knew" the defendants. This argument is unpersuasive. When we look at the nature of Juror No. 1's misconduct and the surrounding circumstances, it cannot be said that it was "substantially likely" a juror was "actually biased" against appellant because Juror No. 1 stated or implied that she knew one or more of the defendants. The circumstances, when viewed objectively, do not establish any "jury tampering" attributable to the defendants in general and even less to appellant. The trial court's instruction adequately admonished the jury to not hold the defendants responsible for Juror No. 1's contact with Darian's girlfriend. The record rebuts any presumption of prejudice stemming from Juror No. 1's conduct.

Regarding Juror No. 4's actions, we agree with the trial court that she committed misconduct when she violated the court's order and discussed Juror No. 1's dismissal. (See *People v. Ledesma, supra,* 39 Cal.4th at p. 743 [trial court properly dismissed juror who violated court order in discussing case with his wife].) As appellant notes, Juror No. 4's conduct cast doubt on her ability to perform her duties as a juror. However, although Juror No. 4's conduct "suggests" bias, as appellant asserts, the record demonstrates that any presumption of bias was overcome. We agree with the trial court's determination that Juror No. 4's misconduct was not prejudicial.

Juror No. 4 merely explained why Juror No. 1 was excused from the panel and repeated Juror No. 1's claims that she knew one or more of the defendants. The record

does not support appellant's contention that Juror No. 4 "used the information to persuade other jurors on the issues." Instead, the information discussed did not pertain to any issues before the jury. It was not substantially likely that a juror was actually biased upon learning the circumstances surrounding why Juror No. 1 was dismissed or that she claimed to have known one or more of the defendants.

Appellant contends the jurors' statements set forth in the declarations cannot be used to rule out actual bias or to conclude the information discussed was "insignificant" because such an analysis relies on "improper subjective factors." This argument is without weight. It is undisputed that the jurors' thought processes are inadmissible regarding whether jury bias occurred. (Evid. Code, § 1150; see *Carpenter, supra,* 9 Cal.4th at p. 652.) However, in order to determine if bias occurred, we examine the objective influences presented to the jury. (*People v. Collins* (2010) 49 Cal.4th 175, 249.) Our review of the declarations in support of the motion for new trial establish that the objective influences presented to the jurors were neither "inherently" nor "substantially likely" to have influenced them or caused actual bias. (*People v. Nesler, supra,* 16 Cal.4th at p. 579; *Carpenter, supra,* 9 Cal.4th at p. 653.)

Nevertheless, in attempting to establish error, appellant contends that the court "may" have used an incorrect legal standard in denying her motion for new trial, arguing the court's ruling suggested appellant bore the burden of proving actual jury bias. We disagree with appellant's assertion. After finding that misconduct was present, the trial court examined whether the misconduct was prejudicial. The trial court's review was proper. (*People v. Loker* (2008) 44 Cal.4th 691, 747 [after determining that juror misconduct occurred, the next consideration is whether the misconduct was prejudicial].) At no time did the trial court expressly or impliedly state that appellant bore the burden of proving prejudice. Instead, the prosecution must rebut the presumption of prejudice that arises whenever juror misconduct is present. (*People v. Hensley, supra,* 59 Cal.4th at p. 824.) Based on this record, the presumption of prejudice was rebutted.

16.

Finally, the evidence introduced at trial against appellant was of sufficient strength to rebut any presumption of actual bias. Both Darwin and McCaleb placed appellant at the scene of the attack. McCaleb testified she witnessed appellant stabbing at Darwin's right wrist. Although Darwin testified he did not see anyone with a knife during the attack, he felt a sharp pain on his right wrist during the attack, which he attributed to a knife. McCaleb's testimony about the knife attack was corroborated by Darwin's "stab" or "sliced" wound to his right wrist.

Appellant only offered A.R.'s testimony to dispute her involvement in the April 14, 2011, assault on Darwin or the brandishing of a weapon at McCaleb. However, the two independent witnesses, Fisher and Riley, established that at least three men attacked Darwin on that day and two females were present at the scene. The testimony from Fisher and Riley seriously undermined the credibility of A.R., who testified that he fought Darwin alone and neither his mother nor his brothers were present during the assault.

Based on the testimony of Darwin and McCaleb, along with the corroborating evidence and testimony, the evidence of appellant's guilt was strong despite appellant's arguments to the contrary. Accordingly, based on our independent review of the record, there was not a substantial likelihood that a juror was actually biased in this matter based on either Juror No. 1 or Juror No. 4's actions. (*People v. Nesler, supra,* 16 Cal.4th at p. 583; *Carpenter, supra,* 9 Cal.4th at p. 654.) Appellant's convictions will not be reversed for juror misconduct.

## II. The Trial Court Did Not Err By Admitting Appellant's Statement.

Appellant contends the trial court abused its discretion in admitting her statement to McCaleb (made during a nonviolent encounter before the charged incident) when she stated that she and her sons "don't talk, they fight." Appellant argues her convictions should be reversed.

17.

## A. Background.

Prior to trial, Kendrick's trial counsel filed an in limine motion to exclude any evidence regarding the defendants' character or any previous uncharged bad acts. The prosecution sought admission, inter alia, of anticipated evidence that appellant told McCaleb before the final assault, "Where we come from, we don't talk. We fight."

During the pretrial hearing on November 16, 2012, the prosecutor noted that this evidence did not "necessarily" go to motive, but more to identity, stating "It's kind of a person that has this attitude is going to be the kind of person that shows up on the 15th of April." The prosecutor cited *People v. Linkenauger* (1995) 32 Cal.App.4th 1603 (*Linkenauger*), as support for admission, inter alia, of appellant's statement to McCaleb. The prosecutor argued that he had to prove identity, anticipating a defense tactic that the victims were lying.

The trial court noted that this evidence was relevant regarding motive, particularly as to why appellant's three sons might have assaulted Darwin. The court also noted the evidence was relevant regarding identity because it would logically help establish who may have assaulted whom in this case.

On November 26, 2012, the court readdressed this issue. The trial court stated that the prior events between appellant (and her sons) with McCaleb and Darwin were relevant as it showed "bad blood" between the families leading up to the final incident. The trial court confirmed with the prosecutor that appellant's statement was only being introduced for purposes of showing appellant's mental state. The trial court determined that appellant's previous statement was admissible, only against her, regarding her state of mind.

At trial, appellant's statement was presented to the jury when McCaleb testified she was walking on the street in March after the January 2011 incident, and appellant drove up and parked next to her. McCaleb asked appellant if appellant could "please tell

18.

her sons to leave us alone." Appellant stated that she and her sons "don't talk, they fight" and McCaleb should have "stayed in a woman's place."

The court gave the following admonishment to the jury: "Ladies and gentlemen, again, this is a statement that's being attributed by the witness to [appellant]. So this statement will be admitted only as to [appellant] and only admitted for the limited purpose as to what her state of mind was at this time."

### B. Standard of review.

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) Irrelevant evidence is inadmissible. (Evid. Code, § 350.) "Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends '"logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Scheid* (1997) 16 Cal.4th 1, 13-14.)

Evidence of past crimes or prior bad acts is inadmissible simply to prove that the defendant had a predisposition to commit the charged offense. (Evid. Code, § 1101, subd. (a); *People v. Malone* (1988) 47 Cal.3d 1, 17.) However, such evidence may be admitted when it is relevant to prove another issue in the case such as opportunity, intent, knowledge, identity, or absence of mistake. (Evid. Code, § 1101, subd. (b); *People v. Malone, supra,* 47 Cal.3d at p. 17.) To be admissible, evidence of past crimes or prior bad acts must also not violate Evidence Code section 352. (*People. v. Malone, supra,* 47 Cal.3d at p. 18.)

An appellate court reviews for abuse of discretion a lower court's ruling under Evidence Code section 1101. (*People v. Davis* (2009) 46 Cal.4th 539, 602.) If character evidence is erroneously admitted, the defendant's conviction will not be reversed unless it is "reasonably probable that a result more favorable to defendant would have been

reached in the absence of the alleged error." (*People v. Thomas* (2011) 52 Cal.4th 336, 356, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### C. Analysis.

Appellant does not contend that her statement was irrelevant evidence. She also does not assert that her statement was more prejudicial than probative under Evidence Code section 352. Instead, she initially asserts that both the prosecutor and the trial court misapplied the law, arguing that the holding in *Linkenauger* does not support admission of her statement.

In *Linkenauger, supra,* 32 Cal.App.4th 1603, the defendant was convicted of first degree murder after the trial court admitted evidence of marital discord and domestic violence towards the murder victim, defendant's wife. (*Id.* at p. 1606.) On appeal, the *Linkenauger* court upheld the ruling because evidence tending to show prior quarrels between the defendant and the decedent, along with threats made by the defendant, went to motive and state of mind ("ill will"). (*Id.* at pp. 1610, 1613-1614.)

Appellant maintains *Linkenauger* is distinguishable because it involved first degree murder, a specific intent crime where intent and identity were at issue, along with domestic violence. Appellant points out that every case cited in *Linkenauger* also involved premeditated murder (or attempted murder) involving domestic violence. Appellant contrasts her situation with those differences, arguing her charges involved general intent crimes,[10] and the only issue present in her case was *whether* she acted and not *why* she acted. Appellant contends her identity was never an issue for the jury because she concedes that she drove the vehicle on April 14, 2011. As such, she asserts

---

[10]    Assault with a deadly weapon under section 245 is a general intent crime. (*People v. Colantuono* (1994) 7 Cal.4th 206, 213.) Brandishing a deadly weapon under section 417 is also a general intent crime. (*People v. Norton* (1978) 80 Cal.App.3d Supp. 14, 25.)

that the legal principle of "prior quarrels" is inapplicable in her case and her statement was improperly admitted to show she was a fighter who fought on the date in question.

Appellant's arguments, however, are neither supported by the facts nor the law. Through A.R.'s trial testimony, appellant disputed that she was involved in the assault on Darwin on April 14, 2011, or that she brandished a weapon at McCaleb. A.R. testified he acted alone in attacking Darwin, which was in direct contradiction to the prosecution's evidence. In light of the contradictory evidence, the jury was required to determine the identity of Darwin's attackers and the scope of appellant's involvement. Indeed, as appellant notes in her reply brief, the issue was whether she "stood by or participated in the assault."

As held in *Linkenauger*, evidence tending to show appellant's prior quarrels with the victims, along with threats made by appellant, establishes motive and state of mind ("ill will"). (*Linkenauger, supra,* 32 Cal.App.4th at pp. 1610, 1613-1614.) Appellant's statement to McCaleb was evidence of a veiled threat and established appellant's motive and ill will. Such evidence was admissible to establish appellant's identity as one of the attackers. (*Id.* at pp. 1613-1614.)

Moreover, a trial court may permit evidence of prior bad acts in a case involving assault when the prior bad acts establish animosity between the defendant and the victim. (*People v. Lopez* (1969) 1 Cal.App.3d 78, 85 (*Lopez*); *People v. Mullen* (1953) 115 Cal.App.2d 340 (*Mullen*).) In *Lopez*, the defendant was charged with, and found guilty of, assault with a deadly weapon. (*Lopez, supra,* 1 Cal.App.3d. at p. 81.) The trial court allowed evidence that the victim's brother fought with the defendant and then testified against the defendant in another criminal prosecution. (*Id.* at p. 85.) On appeal, this court held that the trial judge did not err in admitting the evidence of the defendant's earlier fight because it showed the "animosity which may have arisen between the two families" and "was a meaningful link in the People's chain of incriminating evidence against him." (*Ibid.*) The *Lopez* court noted that because "motive is ordinarily the

21.

incentive for criminal behavior," a trial court has "wide latitude" in admitting such evidence. (*Ibid.*)

Likewise, in *Mullen, supra,* 115 Cal.App.2d 340, the defendant was convicted of malicious assault with a deadly weapon (§ 4501) and possession of a deadly weapon (§ 4502) while he was a state prisoner. The defendant attacked another inmate for allegedly interfering with his intimate relationship with a third inmate. (*Mullen, supra,* at pp. 341-342.) The *Mullen* court held admissible the evidence of prior antagonism or enmity existing between the defendant and his victim because it was relevant to the issue of the defendant's identity as the assailant. (*Id.* at p. 343.)

Here, like in *Lopez* and *Mullen*, the trial judge correctly identified the "bad blood" between appellant's family and Darwin/McCaleb leading up to the final assault. The trial court noted that appellant's statement would logically help establish who may have assaulted whom in the case. Evidence of appellant's past antagonism or enmity was admissible as circumstantial evidence to identify appellant as an attacker. (Evid. Code, § 1101, subd. (b); *Lopez, supra,* 1 Cal.App.3d. at p. 85; *Mullen, supra,* 115 Cal.App.2d at p. 343.) As such, appellant is incorrect that her statement was admitted simply to provide background or to prove she acted in conformity with her statement that she fights. *Mullen* is not distinguishable as appellant argues because her identity and motive were at issue as to her involvement in the events on April 14, 2011.

Appellant's remaining arguments are without merit. It is immaterial that appellant's statement did not occur during an actual quarrel, as appellant notes, or that her statement was made only to McCaleb and without Darwin present. Instead, appellant's statement was part of the ongoing "bad blood" between the two families, which she concedes started with the January altercation. The defendants hoped to establish that Darwin instigated the January altercation, and it was that event which McCaleb referenced just before appellant made her disputed statement.

22.

It is also immaterial that the prosecutor did not emphasize "motive" as a reason for admission of appellant's statement, as appellants asserts, because our review focuses on whether the trial court abused its discretion. (*People v. Davis, supra,* 46 Cal.4th at p. 602.) In light of the circumstances, the trial court did not abuse its discretion in allowing her statement into evidence for the limited purpose of showing her mental state. (*Lopez, supra,* 1 Cal.App.3d. at p. 85; *Mullen, supra,* 115 Cal.App.2d at p. 343.)

Finally, even if the trial court erred in admitting this evidence, appellant cannot establish prejudice. As noted above, the evidence establishing appellant's guilt was strong. Even if the trial court had erred in admitting appellant's statement, it was not reasonably probable that a result more favorable to appellant would have occurred absent the alleged error. (*People v. Thomas, supra,* 52 Cal.4th at p. 356.) Accordingly, appellant's convictions will not be reversed.

## III.    The Abstract Of Judgment Requires Correction.

Appellant argues that the abstract of judgment contains three errors.[11] First, the abstract erroneously lists the sentence on count 1 as "concurrent" even though it was stayed by the trial court. Second, the abstract erroneously lists $240 in court fees even though the court imposed only four such fees totaling $160. Finally, the trial court ordered appellant to pay a minimum restitution fine pursuant to section 1202.4, subdivision (b), in the amount of $280 in both cases. Appellant contends the restitution fines should be $200 in case No. BF136520C and $240 in case No. BF143949C.

Respondent concedes appellant's three arguments. We accept respondent's concession as proper.

First, at sentencing, the trial court stayed count 1 in case No. BF136520C, which the abstract fails to reflect. We order the abstract amended to reflect the trial court's

---

[11]    The abstract of judgment memorialized the convictions from case Nos. BF136520C and BF143949C.

23.

sentence. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186 [abstract of judgment must be corrected to reflect the oral judgment of sentencing court].)

Second, section 1465.8 requires a court fee of $40 for every conviction. (§ 1465.8.) Appellant was convicted of two felonies and one misdemeanor in case No. BF136520C, and one felony in case No. BF143949C. Thus, the total fees imposed should have totaled $160. The abstract incorrectly lists the total fees as $240, which we order amended. (*People v. Mitchell, supra,* 26 Cal.4th at pp. 185-186.)

Finally, the record demonstrates that the trial court intended to impose the minimum restitution fine in each case. At sentencing on February 25, 2013, and specifically when sentencing codefendant Kendrick, the court imposed a restitution fine of $240, but the probation officer interrupted the court and explained she made a mistake and the fine should be $280 because the report was written prior to the amount changing.[12] As a result, the court then ordered a restitution fine of $280, which was used in both of appellant's cases.

However, in case No. BF136520C, when appellant committed the offenses on April 14, 2011, the minimum restitution fine was $200. (Former § 1202.4, subd. (b)(1) (2011); *People v. Kramis* (2012) 209 Cal.App.4th 346, 349-350.) The crime in case No. BF143949C was committed in 2012, when the minimum restitution fine was $240. (§ 1202.4, subd. (b)(1).)

Legislation may not make more burdensome the punishment for a crime after its commission. (*People v. McVickers* (1992) 4 Cal.4th 81, 84 [ex post facto clause is

---

[12] The probation officer's report was prepared on December 26, 2012, and filed on February 25, 2013. The sentencing judge read and considered it on January 7, 2013. Starting on January 1, 2013, the minimum restitution fine was $280. (§ 1202.4, subd. (b)(1).) However, the year prior, as of January 1, 2012, the minimum fine had been $240. (*Ibid.*) The probation officer's report recommended a fine of $240, but someone handwrote an "8" over that amount.

violated for legislation that punishes a criminal defendant after the fact].) "A restitution fine qualifies as punishment for purposes of the prohibition against ex post facto laws." (*People v. Saelee* (1995) 35 Cal.App.4th 27, 30.) When the minimum fine is imposed, the trial court must set the minimum amount applicable on the date of the crimes. (*Id.* at pp. 30-31.)

Here, the trial court had discretion to impose more than the minimum restitution fine. (§ 1202.4, subd. (b)(1).) However, the record demonstrates that the court intended to impose the minimum fine but the recommended amount in the probation officer's report was in error, which was further compounded when the probation officer verbally advised the court that the fine was the minimum amount statutorily in place in 2013. As a result, as respondent agrees, the restitution fine is reduced to $240 in case No. BF143949C and $200 in case No. BF136520C.

## DISPOSITION

This matter is remanded to the trial court to correct the abstract of judgment as follows: reflect that count 1 was stayed; reflect total court security fees of $160; and reflect restitution fines of $240 in case No. BF143949C and $200 in case No. BF136520C. The trial court shall then forward the amended abstract of judgment to the appropriate authorities. The judgment is otherwise affirmed.

_____

LEVY, Acting J.

WE CONCUR:


_____

PEÑA, J.


_____

SMITH, J.

25.